**In re: SEALED CASE**

Nos. 97–3006, 97–3007.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 20, 1997.

Filed Aug. 29, 1997.

Brett M. Kavanaugh, Associate Counsel, Washington, DC, argued the cause for appellant, with whom Kenneth W. Starr, Independent Counsel, Washington, DC, Kimberly Nelson Brown and Craig S. Lerner, Associate Counsel, Washington, DC, were on the brief.

James Hamilton argued the cause for appellees, with whom Andrew L. Lipps, Michael L. Spafford, Washington, DC, William J. Mertens and Robert V. Zener, Washington, DC, were on the brief. ·

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge WILLIAMS.

Dissenting opinion filed by Circuit Judge TATEL.

STEPHEN F. WILLIAMS, Circuit Judge:

This case arises out of a grand jury investigation into the firing of White House travel office employees. The Office of Independent Counsel obtained grand jury subpoenas for notes of a conversation between a now-deceased White House official and his private attorney. The attorney and his law firm moved in district court to quash the subpoenas, claiming successfully that the notes were protected by the attorney-client privilege and by the work-product privilege. Because we think the district court read both privileges too broadly, we reverse and remand for further proceedings.

### Attorney–Client Privilege

■ The attorney-client privilege applies to grand jury proceedings. Fed.R.Evid. 501, 1101(c) & (d). The parties agree that the communications at issue would be covered by

the privilege if the client were still alive. The Independent Counsel, however, argues that the client's death calls for a qualification of the privilege. We agree.

Rule 501 provides that "the privilege of a witness ... shall be governed by the principles of the common law as ... interpreted by the courts ... in the light of reason and experience." Fed.R.Evid. 501; see also *Jaffee v. Redmond,* —— U.S. ——, ——, 116 S.Ct. 1923, 1927, 135 L.Ed.2d 337 (1996). We take this to be a mandate to the federal courts to approach privilege matters in the way that common law courts have traditionally addressed any issue—observing precedent but at the same time trying, where precedents are in conflict or not controlling, to find answers that best balance the purposes of the relevant doctrines.

Courts have generally assumed that the privilege survives death. See Simon J. Frankel, "The Attorney–Client Privilege After the Death of the Client," 6 Geo. J. Legal Ethics 45, 47 (1992) (citing cases). Modern evidence codes often provide that the personal representative of a deceased client may assert the privilege. See Restatement (Third) of the Law Governing Lawyers § 127 Reporter's Note, comment c (Proposed Final Draft, March 29, 1996) ("Restatement"). And courts have applied the privilege after death in both grand jury proceedings and criminal trials. See, e.g., *John Doe Grand Jury Investigation,* 408 Mass. 480, 562 N.E.2d 69 (1990); *People v. Pena,* 151 Cal. App.3d 462, 198 Cal.Rptr. 819, 829 (1984); *State v. Doster,* 276 S.C. 647, 284 S.E.2d 218 (1981).

■ Yet most judicial references to the persistence of the privilege after death appear to have occurred only as the prelude to application of a well recognized exception— for disputes among the client's heirs and legatees.[1] See Frankel, *supra,* at 58 n. 65 (95% of cases examined (380 out of 400) were

---

1. The exception applies only when the parties are claiming "through the client," not when a party claims against the estate. Some have justified the exception as furthering the client's intent, while others have explained that in a will contest, the question of who may assert the privilege cannot be resolved without resolving the merits of the claims, and thus it is preferable to permit neither to assert the privilege. See 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 197, at 377–78 (2d ed.1994). As neither justification bears on our analysis, we need not choose between them.

testamentary disputes). Thus holdings actually *manifesting* the posthumous force of the privilege are relatively rare. See McCormick on Evidence § 94, at 348 ("the operation of the privilege has in effect been nullified in the class of cases where it would most often be asserted after death."). And such cases as do actually apply it give little revelation of whatever reasoning may have explained the outcome.

The Supreme Court's decision in *Glover v. Patten*, 165 U.S. 394, 17 S.Ct. 411, 41 L.Ed. 760 (1897), is cited for the proposition that the privilege survives death. See, e.g., *Baldwin v. Commissioner of Internal Revenue*, 125 F.2d 812, 814 (9th Cir.1942). In fact, however, *Glover* is simply a typical case that asserts the general principle of the privilege's survival after death, but finds it inapplicable to disputes among persons "claiming under the client." 165 U.S. at 407, 17 S.Ct. at 416. Even the Court's endorsement of the privilege's survival in ordinary circumstances was rather tepid. It observed that "such communications might be privileged if offered by third persons to establish claims against an estate," *id.* at 406, 17 S.Ct. at 416, and quoted *Russell v. Jackson*, 9 Hare 387, 393, 68 Eng. Rep. 558, 560 (1851), which stated only that "the privilege does not in all cases terminate with the death of the party," and belongs to "parties claiming under the client as against parties claiming adversely to him." *Id.*, quoted in *Glover*, 165 U.S. at 407, 17 S.Ct. at 416. Compare Cal. Evid.Code § 954, comment (1997) ("[T]here is little reason to preserve secrecy at the expense of excluding relevant evidence after the estate is wound up and the representative is discharged."). In short, there is little by way of judicial holding that affirms the survival of the privilege after death, and the framing of the posthumous privilege as belonging to the client's estate or personal representative both suggests that the privilege may terminate on the winding up of the estate and reflects a primary focus on civil litigation.[2]

Although courts often cite as axiomatic the proposition that the privilege survives death, commentators have, with one distinguished exception, generally supported some measure of post-death curtailment. The exception, Wigmore, proclaimed that there was "no limit of time beyond which the disclosures might not be used to the detriment of the client or of his estate." 8 Wigmore on Evidence § 2323, at 630–31 (McNaughton Rev.1961). But others have sharply criticized his view. The most emphatic statement is that of Wright & Graham, who wrote, "One would have to attribute a Pharaoh-like concern for immortality to suppose that the typical client has much concern for how posterity may view his communications." 24 Charles A. Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence § 5498, at 484 (1986); see also Restatement § 127, comment d ("Permitting such disclosure would do little to inhibit clients from confiding in their lawyers")[3]; 1 McCormick on Evidence § 94, at 350 (4th ed.1992) (terminating the privilege at death "could not to any substantial degree lessen the encouragement for free disclosure"); 2 Mueller & Kirkpatrick § 199, at 380 ("Few clients are much concerned with what will happen sometime after the death that everyone expects but few anticipate in an immediate or definite sense").

Presumably depending on their confidence in their judgments as to the residual chilling effect on clients, commentators have proposed a range of substitute rules. Some have embraced Learned Hand's view that the privilege should not apply at all after death, see, e.g., ALI Proceedings, 1942, quoted in 24 Wright & Graham § 5498, at 485; 1 McCor-

---

2. Our dissenting colleague evidently reads the provisions allowing the personal representative of the deceased to claim the privilege as implying that the privilege survives death without exception (other than the standard testamentary one). See Dissent at 3. But the inference is far from clear. Vesting the privilege in the personal representative is plainly consistent with its terminating at the winding up of the estate, when its function of protecting the decedent's transmission of his or her property to the intended benefi-

ciaries, free from claims based on statements to counsel, has run its course. Such vesting does not remotely suggest concern over anyone's criminal responsibility.

3. Drafts of portions of the Restatement (Third) of the Law Governing Lawyers, including § 127, have been tentatively approved by the American Law Institute's Council and membership but have not yet been finally adopted.

mick on Evidence § 94, at 350, while the American Law Institute has suggested a general balancing test, proposing that

> a tribunal be empowered to withhold the privilege of a person then deceased as to a communication that bears on a litigated issue of pivotal significance. The tribunal could balance the interest in confidentiality against any exceptional need for the communication. The tribunal also could consider limiting the proof or sealing the record to limit disclosure.

Restatement § 127, comment d.

The justification for the attorney-client privilege has largely been an instrumental one, resting on a belief that it greatly facilitates—perhaps is essential to—the provision of legal advice. Such assistance "can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). In addition, some have spoken of privacy concerns, see Frankel, *supra*, at 53–54 & nn.41–45 (citing commentators), but it seems fair to say that these have played at best a secondary role. In any event, because the privilege obstructs the truth-finding process, it is, we have said, to be narrowly construed. *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 675 (D.C.Cir.1979).

The object, presumably, is to maximize the sum of the benefits of confidential communications with attorneys and those of finding the truth through our judicial processes. Even if the focus were solely on truth-seeking, dispensing with the privilege altogether would presumably have negative results. Any rule qualifying the privilege may in at least some cases (once it is adopted) cause some clients to confide less in their attorneys; the communication that is stillborn can never be disclosed. And abrogation of the privilege would clearly impair the provision of legal services. Except to the extent that

limits on the privilege *actually* chill the hoped-for communications, however, its application renders judicial proceedings less accurate.

Wright & Graham's supposition that favoring survival of the privilege after death requires imputing a "Pharaoh-like concern" to clients may be a bit of an exaggeration. But it is surely true that the risk of post-death revelation will typically trouble the client less than pre-death revelation. The question is how much less, and the answer seems likely to depend on the context. On one side, criminal liability will have ceased altogether. Civil liability, on the other hand, characteristically continues, and the same impulses that drive people to provide for their families in life clearly create a motive to preserve their estates thereafter.[4] In the middle are reputational concerns. To the extent that concern over reputation arises from an interest in the sort of treatment a person will receive from others—ranging from mundane matters such as extension of credit to more subtle ones such as how one will be greeted at social events—it ends with death. But there are aspects of after-death reputation that will concern a person while alive—the value to surviving family of being related to (say) an honorable and distinguished person, and the value of one's posthumous reputation simpliciter (the pure Pharaoh effect). In the sort of high-adrenalin situation likely to provoke consultation with counsel, however, we doubt if these residual interests will be very powerful; and against them the individual may even view history's claims to truth as more deserving. To the extent, then, that any post-death restriction of the privilege can be confined to the realm of criminal litigation, we should expect the restriction's chilling effect to fall somewhere between modest and nil.

The costs of protecting communications after death are high. Obviously the death

---

4. The impulse would also apply to a corporation with which a decedent has been involved, but the privilege there would characteristically belong to the corporation. See, e.g., *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 n. 5 (8th Cir.1977). Thus rules regarding termination of the privilege on the biological death of the client are largely irrelevant. For a discussion of the privilege and organizational successors, see 24 Wright & Graham § 5499; 2 Mueller & Kirkpatrick § 200; see also *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (corporate bankruptcy trustee controls and therefore may waive the privilege).

removes the client as a direct source of information; indeed, his availability has been conventionally invoked as an explanation of why the privilege only slightly impairs access to truth. American Bar Association's Committee on the Improvement of the Law of Evidence, quoted in 8 Wigmore § 2299, at 579. Thus the fewer, and the more questionable the remaining sources (e.g., because of witnesses' interest or bias), the greater the relative value of what the deceased has told his lawyer. Although witness unavailability alone would not justify qualification of the privilege, we think that unavailability through death, coupled with the non-existence of any client concern for criminal liability after death, creates a discrete realm (use in criminal proceedings after death of the client) where the privilege should not automatically apply. We reject a general balancing test in all but this narrow circumstance.

In rejecting two rather ambiguous limitations for privileges—the so-called "control-group" qualification of the attorney-client privilege, *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), and·a "balancing" test for the psychotherapist-patient privilege, *Jaffee v. Redmond*, —— U.S. ——, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996)—the Supreme Court observed, "An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn*, 449 U.S. at 393, 101 S.Ct. at 684; *Jaffee*, —— U.S. at ——, 116 S.Ct. at 1932. Accordingly, to the extent that the commentators may be read as urging some sort of generalized balancing test for posthumous limitation of the privilege, we disagree. We thus embrace the arguments for such an exception only within the discrete zone of criminal litigation. While we believe that a case-by-case balancing is appropriate *within* that realm, we see no basis for any further exception (apart of course from the long-established exception for litigation among those claiming under the decedent).

Even such a discrete exception, of course, complicates what the lawyer must tell an anxious client about the confidentiality of a prospective conversation. But in assessing that incremental complication, we recognize that even now any belief in an absolute attorney-client privilege is illusory. See Edna S. Epstein, The Attorney–Client Privilege and the Work–Product Doctrine 3 (1997) ("Many communications that clients and lawyers mistakenly believe are privileged in fact are not."). First, even communications made in confidence in the search for legal advice are unprotected if they relate to future illegality (the "crime-fraud exception"). See Wright & Graham § 5501. The dissent contends that a client can be certain whether his communications will fall under the crime-fraud exception, but this underestimates its slipperiness. We have acknowledged that "there may be rare cases ... in which the attorney's fraudulent or criminal intent defeats a claim of privilege even if the client is innocent," *In re Sealed Case*, 107 F.3d 46, 49 n. 2 (D.C.Cir. 1997), citing *In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213–14 (3d Cir.1989), which indeed applies the exception in the face of client innocence. And the exception applies not only to crimes and fraud, but to other intentional torts. See *In re Sealed Case*, 754 F.2d 395, 399 (D.C.Cir.1985) (applies to "crime, fraud or other misconduct"); see also *Irving Trust Co. v. Gomez*, 100 F.R.D. 273, 277 (S.D.N.Y.1983) (communications unprotected where client who wrongfully deprived another of use of his bank funds reasonably should have known that such conduct constituted "fraud or any other intentional tort"); *Diamond v. Stratton*, 95 F.R.D. 503, 505 (S.D.N.Y.1982) (no protection where communication in furtherance of intentional infliction of emotional distress).

There is also the ubiquitous exception for litigation between persons claiming under the decedent—although in many contexts (including most imaginable conversations about the White House travel office firings) the improbability of its application would be readily apparent at the outset of the client-lawyer communication. Although this exception is sometimes justified as reflecting the decedent's likely intent, see note 1 *supra*, it does not perfectly track that idea; a decedent might want to provide for an illegitimate child but at the same time much prefer that the relationship go undisclosed. Further, in some states the privilege does not

survive the winding up of an estate, Cal. Evid.Code § 954, and in others it may not do so, see Restatement § 127, Reporter's Note, comment c; 24 Wright & Graham § 5498, at 485.[5] Finally, even courts applying the privilege to bar statements of a decedent from a criminal trial have acknowledged that a defendant might in some cases have a constitutional right to offer statements that exonerate him. *John Doe Grand Jury Investigation,* 562 N.E.2d at 71–72 (privilege survives death except where mandated by constitutional considerations); *State v. Doster,* 276 S.C. 647, 284 S.E.2d 218, 220 (1981) (court upholds exclusion of communications, saying that the defendant was denied not the right to establish his defense but merely "the license to fish into privileged communications"). Compare *Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1111–12, 39 L.Ed.2d 347 (1974) (state interest in anonymity for juvenile offender cannot trump defendant's right of confrontation).

While some of these exceptions are within the client's control, that cannot be said of all. Thus a lawyer who tells his client that the expected communications are absolutely and forever privileged is oversimplifying a bit. (Given the likely impatience of the client with what may seem legalistic detail, the oversimplification may be justifiable; we need not say.) Accordingly the incremental uncertainty introduced by this exception is hardly devastating. And admission of an exception limited to post-death use in criminal proceedings produces none of the murkiness that persuaded the Court in *Upjohn* and *Jaffee* to reject the limitations proposed there.

Even in the realm of criminal proceedings (including grand jury proceedings), this exception should apply only to communications whose relative importance is substantial. Thus, the statements must bear on a significant aspect of the crimes at issue, and an aspect as to which there is a scarcity of reliable evidence. Where there is an abundance of disinterested witnesses with

unimpaired opportunities to perceive and unimpaired memory, there would normally be little basis for intrusion on the intended confidentiality. This should limit release to contexts where not only is the risk of chilling effect slight but keeping the communications secret would be quite costly. Cf. *In re Sealed Case,* 116 F.3d 550, 577 (D.C.Cir. 1997) (need shown where "it is likely that the subpoenaed materials contain important evidence and . . . this evidence, or equivalent evidence, is not practically available from another source").

■ Review by the district court *in camera* may play a role in application of this exception. Where the proponent has offered facts supporting a good faith reasonable belief that the materials may qualify for the exception (a standard plainly met here by the Independent Counsel), the district court should in its sound discretion examine the communications to see whether they in fact do. See *United States v. Zolin,* 491 U.S. 554, 570–72, 109 S.Ct. 2619, 2629–31, 105 L.Ed.2d 469 (1989). To the extent that the court finds an interest in confidentiality, it can take steps to limit access to these communications in a way that is consonant with the analysis justifying relaxation of the privilege.[6] See 2 Mueller & Kirkpatrick § 199, at 380–81.

### Work–Product Privilege

■ The work-product privilege created by *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), may in some cases protect more material than the attorney-client privilege, because it "protects both the attorney-client relationship and a complex of individual interests particular to attorneys that their clients may not share." *In re Sealed Case,* 676 F.2d 793, 809 (D.C.Cir. 1982). The "opinions, judgments, and thought processes of counsel" are generally protected, and the person seeking them must show extraordinary justification. *Id.* at 809–10. For relevant, nonprivileged facts, howev-

---

**5.** The record reveals nothing of the status of the decedent's estate in this case, and the Independent Counsel makes no claim based on its status.

**6.** In considering the interest in confidentiality, the court may in appropriate circumstances pro-

tect innocent third parties from disclosure as well. Here, of course, Federal Rule of Criminal Procedure 6(e)'s provision of secrecy for grand jury proceedings gives additional protection.

er, their being embodied in work product merely shifts the standard presumption in favor of discovery, so that they are discoverable where the person seeking discovery satisfies the standard of Rule 26(b)(3) of the Federal Rules of Civil Procedure, which requires a showing of "substantial need" and "the inability to obtain the substantial equivalent of the information ... from other sources without 'undue hardship.'" *Id.* at 809 n. 59 (identifying that language as an expression of *Hickman*'s "adequate reasons" formula).[7]

■ The district court found that the notes were protected by the work-product privilege because they "reflect the mental impressions" of the attorney. In *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Court observed that "[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." *Id.* at 399, 101 S.Ct. at 687. But the Court did not decide whether factual elements embodied in such notes should be accorded the virtually absolute protection that the privilege gives to the attorney's mental impressions. *Id.* at 401, 101 S.Ct. at 688. Indeed, its reasoning seems to presuppose that such notes are analytically divisible; in refraining from formulation of a specific test, the Court said that the notes in question represented *either* communications protected by the attorney-client privilege (which was applicable, in contrast to the present case) *or* mental impressions protected by work-product privilege. *Id.*; see also *United States v. Paxson,* 861 F.2d 730, 736 (D.C.Cir.1988) (noting that *Upjohn* did not formulate a test for factual matter embodied in lawyer's notes on conversations with witnesses and finding in the case before it no "strong showing" of necessity).

In *In re Sealed Case,* 856 F.2d 268 (D.C.Cir.1988), a party asked Securities and Exchange Commission lawyers on deposition for their *recollections* of witness interviews. Citing *Upjohn,* 449 U.S. at 401–02, 101 S.Ct.

at 688–89, we said that "[a]s the work product sought here is based on oral statements from witnesses, a far stronger showing is required than the 'substantial need' and 'without undue hardship' standard applicable to discovery of work-product protected documents and other tangible things." *Sealed Case,* 856 F.2d at 273. And in B*etter Government Bureau, Inc. v. McGraw,* 106 F.3d 582, 607–08 (4th Cir.1997), the court upheld the privilege as to the *contested* portion of an attorney's memo of an interview, observing that those portions "tend[ed] to indicate the focus of [the lawyer's] investigation, and hence, her theories and opinions regarding this litigation." See also *Cox v. Administrator, U.S. Steel,* 17 F.3d 1386, 1422 (11th Cir.1994).

All three of the above cases involved interviews conducted as part of a litigation-related investigation. (Our *Sealed Case,* 856 F.2d 268, in addition involves unrecorded recollections of interviews and was thus not within the coverage of Rule 26(b)(3).) Accordingly, as *Allen* reasoned, the facts elicited necessarily reflected a focus chosen by the lawyer. Here the interview was a preliminary one initiated by the client. Although the lawyer was surely no mere potted palm, one would expect him to have tried to encourage a fairly wide-ranging discourse from the client, so as to be sure that any nascent focus on the lawyer's part did not inhibit the client's disclosures.

Accordingly, unless the general possibility that purely factual material may reflect the attorney's mental processes (either in questioning or in recording) is enough to shroud all lawyers' notes in the super-protective envelope reserved by Rule 26(b)(3) for "mental impressions," we think such material should be reachable when true necessity is shown. Where the context suggests that the lawyer has not sharply focused or weeded the materials, the ordinary Rule 26(b)(3) standard should apply.

Our brief review of the documents reveals portions containing factual material that

---

7. Because of this apparent identity between the common law standard and that of Rule 26(b)(3), it appears to make little difference whether Federal Rule of Civil Procedure 81(a)(3) merely

makes Rule 26 applicable to the procedure of litigation over grand jury subpoenas or also defines the substance of the privilege. See *In re Sealed Case,* 676 F.2d at 808 n. 49.

could be classified as opinion only on a virtually omnivorous view of the term. We cannot therefore accept the district court's conclusion that they are protected in their entirety.

\*　　\*　　\*

We reverse and remand the case to the district court to reexamine the documents in light of this opinion. The documents may be redacted so that the grand jury receives only those portions that are protected by neither the attorney-client nor the work-product privilege.

*So ordered.*

TATEL, Circuit Judge, dissenting: \*

Offered no persuasive reason to depart from the common law's posthumous protection of the attorney-client privilege and appreciating its importance in encouraging "full and frank communication" by clients with their lawyers, I would affirm the district court's judgment that the privilege protects the attorney's notes of his conversation with his now-deceased client. I therefore need not consider whether the notes are attorney work product.

I

Finding its first expression in the courts of Elizabethan England, *see* 8 WIGMORE, EVIDENCE § 2290 (McNaughton rev.1961), and accepted in the courts of the United States from the earliest days of the republic, *see, e.g., Chirac v. Reinicker,* 24 U.S. (11 Wheat.) 280, 294, 6 L.Ed. 474 (1826), the attorney-client privilege is the oldest privilege for confidential communications known to the common law. Extending well beyond protecting the interests of clients, the privilege "encourage[s] full and frank communication between attorneys and their clients and thereby promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Fully informed lawyers participating in the legal system as officers of the court sharpen the adversary process, thus improving the quality of judicial decisionmaking and the development of the law. By encouraging individuals to consult lawyers and disclose to them candidly and fully, the attorney-client privilege also allows the nation's legal profession to help individuals understand their legal obligations and facilitate their voluntary compliance with them. Such voluntary compliance is particularly important to a free society which neither has nor should want sufficient law enforcement resources to search out and punish every violation of every law. *See id.; see also Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980); *In the Matter of a John Doe Grand Jury Investigation,* 408 Mass. 480, 562 N.E.2d 69, 70 (1990).

The attorney-client privilege recognizes that sound legal advice does not "spring from lawyers' heads as Athena did from the brow of Zeus," *In re Sealed Case,* 737 F.2d 94, 99 (D.C.Cir.1984), but instead depends "upon the lawyer's being fully informed by the client." *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682. Although on occasion the attorney-client privilege can "ha[ve] the effect of withholding relevant information from the factfinder," *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976), courts sustain the privilege in individual cases to accomplish its larger systemic benefits—the greater law compliance and fairer judicial proceedings resulting from the "sound legal advice [and] advocacy" the privilege promotes. *Upjohn,* 449 U.S. at 389, 101 S.Ct. at 682.

Like the spousal, priest-penitent, and psychotherapist-patient privileges, the attorney-client privilege is " 'rooted in the imperative need for confidence and trust.' " *Jaffee v. Redmond,* —— U.S. ——, ——, 116 S.Ct. 1923, 1928, 135 L.Ed.2d 337 (1996) (quoting *Trammel,* 445 U.S. at 51, 100 S.Ct. at 913). As the Supreme Court recognized more than a century ago, the assistance of counsel "can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn,* 128

---

\* In order to preserve the secrecy of the grand jury proceedings, selected portions of this dissent have been deleted from the published opinion.

U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). Because individuals frequently seek legal counsel concerning embarrassing, disgraceful, or criminal conduct, "the mere possibility of disclosure" of communications about such subjects may "impede development of the confidential relationship," *Jaffee*, —— U.S. at ——, 116 S.Ct. at 1928, thereby eroding the substantial benefits to the justice system afforded by well-informed legal counsel. Lawyers who have represented clients in sensitive matters know the key words to full disclosure:

> I cannot represent you effectively unless I know everything. I will hold all our conversations in the strictest of confidence. Now, please tell me the whole story.

Since at least the mid-nineteenth century, the common law has protected the attorney-client privilege after a client's death. *See, e.g., Hart v. Thompson's Executor*, 15 La. 88, 93 (1840) (upholding privilege after client's death); SIMON GREENLEAF, 1 TREATISE ON THE LAW OF EVIDENCE 310 (1850) (privilege not affected by death of client). Other than in testamentary disputes, for which there exists a well-established and independently justified exception not applicable to the case before us, *see, e.g., Glover v. Patten*, 165 U.S. 394, 406–08, 17 S.Ct. 411, 415–17, 41 L.Ed. 760 (1897), both state and federal courts have consistently followed the common law rule, whether the privilege is claimed in civil litigation, *see, e.g., United States v. Osborn*, 561 F.2d 1334 (9th Cir.1977); *Baldwin v. Commissioner of Internal Revenue*, 125 F.2d 812, 814 (9th Cir.1942); *People v. Pena*, 151 Cal. App.3d 462, 198 Cal.Rptr. 819, 828 (1984); *Lamb v. Lamb*, 124 Ill.App.3d 687, 80 Ill.Dec. 8, 464 N.E.2d 873, 877 (1984); *Bailey v. Chicago, Burlington & Quincy R.R. Co.*, 179 N.W.2d 560, 564 (Iowa 1970), or in criminal proceedings, *see, e.g., State v. Macumber*, 112 Ariz. 569, 544 P.2d 1084, 1086 (1976); *John Doe Grand Jury Investigation*, 562 N.E.2d at 72; *People v. Modzelewski*, 203 A.D.2d 594, 611 N.Y.S.2d 22, 23 (N.Y.App.Div.1994); *Cooper v. State*, 661 P.2d 905, 907 (Okla.Cr. App.1983); *State v. Doster*, 276 S.C. 647, 284 S.E.2d 218, 219 (1981); *see also* 8 WIGMORE, EVIDENCE § 2323 & n.2 (citing additional cases). Incorporated in the model codes of evidence, *see id.* § 2292 n.2 (quoting Uniform Rule of Evidence § 26(1)); MODEL CODE OF EVIDENCE, Rule 209(c)(i) (1942), adopted by the Supreme Court's Advisory Committee, *see* 1 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE 521 (discussing Standard 503), and codified by at least twenty state legislatures, *see, e.g.,* GREGORY P. JOSEPH & STEPHEN A. SALZBURG, EVIDENCE IN AMERICA: THE FEDERAL RULES IN THE STATES § 24.2 (1992) (citing 19 state codes); CAL. EVID. CODE § 953 (West 1995), the common law rule admits "no exception" that outside the testamentary context, the attorney-client privilege survives the client's death. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 127 cmt. d (Proposed Final Draft No. 1, 1996); *see also id.* (citing additional authorities); EDNA S. EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 234 (3d ed.1997) ("The duration of the privilege, once it attaches, persists unless the lawyer is released by the client. Upon the death of the client, no release is possible. Hence death should seal the lawyer's lips forever.").

Although rarely articulated, the rationale underlying the common law rule makes sense. By preserving the privilege after the client's death, the law ensures that the privacy afforded those who confide in counsel extends to those who would otherwise take their secrets to the grave. The common law rule thus encourages individuals to seek legal advice, bringing the benefit of such consultation to themselves, the legal system, and society. *See Fisher*, 425 U.S. at 403, 96 S.Ct. at 1576 ("As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice."). As Wigmore explains:

> The subjective freedom of the client, which it is the purpose of the privilege to secure ..., could not be attained if the client understood that, when the relation ended or even after the client's death, the attorney could be compelled to disclose the confidences, for there is no limit of time beyond which the disclosures might not be

used to the detriment of the client or of his estate.

8 WIGMORE, EVIDENCE § 2323.

## II

Justifiably unwilling to embrace the Independent Counsel's call for wholesale abrogation of the privilege in federal criminal cases after a client's death, the court today adopts a balancing test under which posthumous availability of the privilege turns on an ex post facto assessment of the evidence's importance, a test that neither party to this litigation advocates and that, notwithstanding protestations to the contrary, Maj. Op. at 231–32, represents a dramatic departure from the common law rule. The court cites no cases supporting its new rule, relying instead on views of commentators never accepted by any court or legislature. *See, e.g.,* 24 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5498 (1986 & Supp.1997); Maj. Op. at 232–33. The court sees particular significance in a draft revision of the Restatement (Third) of the Law Governing Lawyers supporting a posthumous exception to the common law rule. Maj. Op. at 233. The Restatement, however, candidly acknowledges that "no court or legislature has adopted" such an exception. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 127, cmt. d (Proposed Final Draft No. 1, 1996). The court also observes that the common law rule is most often stated in cases involving the testamentary exception and that "holdings actually *manifesting* the posthumous force of the privilege are relatively rare." Maj. Op. at 232 (emphasis in original). These observations prove nothing. Such holdings appear rarely not because judicial recognition of a posthumous privilege is "tepid," *id.* at 232, but because situations where the attorney-client privilege is challenged after a client's death occur rarely. Most significantly, in all but one reported case where the attorney-client privilege was challenged after a client's death, courts have upheld the privilege, even where the result denied critical information to the trier of fact. *See, e.g., John Doe Grand Jury Investigation,* 562 N.E.2d at 72 (attorney could not be compelled to testify about what deceased

client told him prior to committing suicide, even though the testimony might have brought an end to murder investigation); *Macumber,* 544 P.2d at 1086 (trial court properly excluded testimony of two attorneys that a person other than the defendant had confessed to them of committing the murder for which defendant was tried); *see also* Simon J. Frankel, *The Attorney–Client Privilege After the Death of the Client,*6 GEO. J. LEGAL ETHICS 45, 65 (1992). *But see Cohen v. Jenkintown Cab Co.,* 238 Pa.Super. 456, 357 A.2d 689, 693 (1976) (where testimony sought did not contain "scandalous and impertinent matter which would serve to blacken the memory" of the deceased client, and where need for testimony is "clearly established," court could compel attorney to testify).

There is a very good reason why no case law supports my colleagues' new balancing test: Unless clients know before consulting their lawyers exactly what information the privilege protects—knowledge denied by the court's balancing test—few will confide candidly and fully. After this decision, lawyers will have to add an important caveat to what they advise their clients about confidentiality:

> I cannot represent you effectively unless I know everything. I will hold all our conversations in the strictest of confidence. *But when you die, I could be forced to testify—against your interests—in a criminal investigation or trial, even of your friends or family, if the court decides that what you tell me is important to the prosecution.* Now, please tell me the whole story.

Because clients so advised will not know whether their confidences will be protected, they will be less likely to disclose sensitive or potentially inculpatory information. "If the purpose of the attorney-client privilege is to be served," said the Supreme Court in *Upjohn,* "the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected." *Upjohn,* 449 U.S. at 393, 101 S.Ct at 684. As the Court put it, "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Id.* Consistent with this reasoning, federal courts

uniformly hold that where applicable, the attorney-client privilege, unlike qualified privileges, *see, e.g., In re Sealed Case,* 116 F.3d 550 (D.C.Cir.1997) (dealing with executive privilege and requiring specific demonstration of evidence's importance to grand jury investigation and unavailability from other sources), cannot be overridden by a showing of need. *See, e.g., Admiral Ins. Co. v. United States Dist. Ct. for the Dist. of Ariz.,* 881 F.2d 1486, 1494 (9th Cir.1989) (conditional protection of work product doctrine "cannot logically be extended to support an unavailability exception to the attorney-client privilege"); *In re Grand Jury Subpoena,* 599 F.2d 504, 510 (2d Cir.1979) (attorney-client privilege is unqualified); MURL A. LARKIN, FEDERAL TESTIMONIAL PRIVILEGES § 2.01, at 2–7 to 2–8 (citing cases and noting that "once the privilege has been held applicable, information protected thereunder may not be the subject of compelled disclosure regardless of the need or good cause shown"). For the same reasons and citing *Upjohn,* the Supreme Court, in the case of the psychoanalyst privilege, rejected a balancing test which, like the one the court adopts today, turned in large part on the importance of the information sought by the prosecution: "Making the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." *Jaffee,* —— U.S. at ——, 116 S.Ct. at 1932.

My colleagues characterize the absolute nature of the attorney-client privilege as "illusory." Maj. Op. at 234. Pointing to the testamentary exception and to the well-accepted proposition that statements relating to future illegality find no protection in the attorney-client privilege, they suggest that their new exception, limited to criminal proceedings after the client's death, will likewise not weaken the privilege. Both the testamentary exception and the exclusion of statements of future criminality, however, differ significantly from the balancing test the court adopts today. In those two situations, clients know up front with certainty that the statements they make are unprotected by the privilege. Beyond those two clear situations,

clients and their lawyers cannot predict whether a client's statement might some day relate to a criminal investigation, much less whether a court applying my colleagues' balancing test will subsequently decide that the information "bear[s] on a significant aspect of the crimes at issue." *Id.* at 235. Because of this uncertainty, the court's balancing test produces precisely the same "murkiness that persuaded the Court in *Upjohn* and *Jaffee* to reject the limitations proposed there." *Id.*

The court believes its balancing test will not damage the attorney-client privilege because people are generally indifferent to the effect posthumous disclosures of confidences could have on their reputations. This assumption of the unimportance of posthumous reputation, however, runs counter to the rationale underlying the common law rule. *See* Frankel, *The Attorney–Client Privilege After the Death of the Client* at 61–63 & n.91. It also defies both common sense and experience. From Andrew Carnegie's libraries to Henry Ford's foundation, one need only count the schools and universities, academic chairs and scholarships, charitable foundations, research institutes, and sports arenas—even Acts of Congress—bearing the names of their founders, benefactors, or authors to understand that human beings care deeply about how posterity will view them. Evidence of concern for surviving friends and family likewise abounds: people write wills, convey property, buy life insurance, invest for their children's education, and make guardianship arrangements to protect the interests of loved ones. Prominent public officials restrict access to their papers to protect reputations. Of course, such concerns may not influence *every* decision to confide potentially damaging information to attorneys. But because these concerns very well may affect *some* decisions, particularly by the aged, the seriously ill, the suicidal, or those with heightened interests in their posthumous reputations, I cannot accept the court's assumption that the attorney-client relationship will not suffer if the privilege is limited after a client's death. I agree with the Supreme Judicial Court of Massachusetts: "to disclose information given to [an

attorney] by a client in confidence, even though such disclosure might be limited to the period after the client's death, would in many instances ... so deter the client from 'telling all' as to seriously impair the attorney's ability to function effectively." *John Doe Grand Jury Investigation,* 562 N.E.2d at 71.

The facts of the present case vividly illustrate the value a person can place on reputation.

Although I concede that no single case can prove the utility of maintaining the privilege beyond a client's death, this case seems a particularly inappropriate one in which to abrogate the common law's posthumous protection of the attorney-client privilege.

The court suggests that because it limits its balancing test to criminal cases and because criminal liability ceases with death, its test will not chill client communications with their lawyers. Maj. Op. at 233–34. But clients often reveal to their lawyers much more than information about their own criminal liability: they may disclose information that could expose friends, family, or business associates to criminal culpability—which does not terminate with the client's death—as well as information that could damage their own reputations. The possible release of such information could chill the attorney-client relationship just as seriously as the release of information about the client's own criminal liability.

The court claims that unless the privilege terminates at the client's death, information will be lost that could have been sought from the client while alive. *Id.* at 233–34. The common law rule, however, long ago determined that the benefits the legal system gains through recognizing the privilege post-

humously outweigh whatever damage might flow from denying information to the factfinder in a particular case. Further balancing on a case by case basis will undermine the privilege. Moreover, if limiting the scope of the privilege deters "full and frank" attorney-client communication, as the common law assumes, who can say that in the absence of the privilege information later sought in criminal proceedings would have been shared with counsel in the first place? As the Supreme Court explained in the psychotherapist privilege context, "[w]ithout a privilege, much of the desirable evidence to which litigants ... seek access ... is unlikely to come into being." *Jaffee,* —— U.S. at ——, 116 S.Ct. at 1929; *see also* Salzburg, *Privileges and Professionals: Lawyers and Psychiatrists,* 66 VA. L. REV. 597, 610 (1980) ("The privilege creates a zone of privacy in which an attorney and client can create information that did not exist before and might not exist otherwise."). Clients will be particularly reluctant to share critical information with their lawyers in cases where both the client's death and the possibility of criminal investigation are foreseeable. Perhaps this is such a case, for at oral argument, the deceased's lawyer told us:

Nor can I see any way to limit the court's "information loss" argument to cases in which the client has died. Witnesses unable to remember facts, incompetent to testify, or beyond the court's process likewise deny relevant information to the factfinder. Yet neither the Independent Counsel nor this court suggests that we abrogate the attorney-client privilege to fill in these evidentiary gaps. The unavailability of a witness likewise does no greater harm to the factfinding process than an available witness who testifies inaccurately. Again, no one would suggest that we call upon attorneys to corroborate or correct their clients' every statement. The reason is simple: accepting that some information may be lost to a factfinder, we insu-

late the attorney-client relationship from the prospect of these intrusions in order to promote the "'confidence and trust,'" *Jaffee,* —— U.S. at ——, 116 S.Ct. at 1928 (quoting *Trammel,* 445 U.S. at 51, 100 S.Ct. at 913), necessary for the relationship to work and to afford society its benefits. *See Admiral Ins. Co.,* 881 F.2d at 1494 ("Any inequity in terms of access to information is the price the system pays to maintain the integrity of the privilege."). Neither the court nor the Independent Counsel has offered any convincing reason why a client's death should be treated differently than these other circumstances.

At the end of its discussion of the attorney-client privilege, the court suggests that district courts could protect clients' interests by ordering that their lawyers' testimony be kept confidential. Maj. Op. at 235. But evidence essential to the prosecution's case at trial cannot ultimately remain confidential. In any event, the privilege's fundamental purpose is to encourage clients to share information with their lawyers, not to maintain the information's confidentiality. Qualified promises of confidentiality—"Don't worry, if I am compelled to reveal what you tell me, the court will make sure that no one hears it other than the U.S. Attorney and the federal grand jury"—are unlikely to encourage worried clients to make candid and full disclosures to their attorneys.

### III

The court's decision too readily dismisses the continuing vitality of the common law rule in the states. "It is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both 'reason' and 'experience.'" *Jaffee,* —— U.S. at ——, 116 S.Ct. at 1930 (quoting *Funk v. United States,* 290 U.S. 371, 376–81, 54 S.Ct. 212, 213–16, 78 L.Ed. 369 (1933)). The fact that the common law's posthumous recognition of the privilege outside testamentary disputes appears to have been embraced by every state that has codified the privilege—and remains the law in those that have not—counsels against casting it aside simply because the Independent Counsel and a few commentators question its usefulness. That the common law rule was likewise adopted by the Supreme Court's Advisory Committee, as well as by the committees who drafted the Model Code of Evidence and the Uniform Rules of Evidence, reinforces the conclusion that "'reason' and 'experience'" support posthumous protection of the attorney-client privilege. *Id.; Citibank, N.A. v. Andros,* 666 F.2d 1192, 1195 & n. 6 (8th Cir.1981) (Supreme Court Proposed Federal Rule of Evidence 503(c) useful "as a source for defining the federal common law of attorney-client privilege").

Because the court's balancing test strikes a fundamental blow to the attorney-client privilege and jeopardizes its benefits to the legal system and society, I respectfully dissent.