OPINION OF THE COURT
Donald E. Belfi, J.
In a case that is one of first impression, this court is confronted with two novel questions: does the attorney *686 confidential privilege survive the death of the client? And, if indeed the privilege does survive, under what circumstances, if any, may the court pierce through the veil of confidentiality?
I. Background
The defendant, Amerigo Vespucci, was indicted on January 15, 2002 by a grand jury of the County of Nassau, New York, for the death of Richard Hogan. The charges are murder in the second degree as an intentional act under Penal Law § 125.25 (1), and murder in the second degree under circumstances involving a depraved indifference to human life under Penal Law § 125.25 (2). The crime predates the 1995 statutory amendments to the Penal Law, and as such is not a capital offense.
The incident is alleged to have occurred on or about October 28, 1979. In the early morning hours of that day, at the Club Bar on Rockaway Avenue in Valley Stream, Nassau County, New York, the defendant, Amerigo Vespucci, Dennis Carney and Richard Hogan had been talking and drinking at the tavern. After several hours, they left at approximately the same time. Shortly thereafter, Hogan was found stabbed and bleeding to death outside of the bar. Vespucci vanished and was not located by Nassau County law enforcement officers until September 2001.
In addition to Amerigo Vespucci, defendant Dennis J. Carney was also indicted on the same offense under indictment No. 50224 of 1980. By decision and order of the court dated September 24, 1980, the Honorable Edward A. Baker, County Court Judge, dismissed the indictment with leave to re-present. The court file was thereafter sealed. No re-presentment was made to the grand jury. Carney died in 1991.
During Carney’s criminal proceedings, he was represented by two attorneys, Mr. Edward Galison and Mr. Charles Chassen, who is now deceased. On January 22, 2002, Ed Galison, Esq. contacted Thomas Liotti, Esq., attorney for the defendant Vespucci. Mr. Galison informed Mr. Liotti that he had in his possession information that may be deemed exculpatory to Vespucci’s case. Mr. Galison said he wás directed by the Nassau County Bar Association Ethics Committee to disclose to Mr. Liotti and Joy Watson, the Assistant District Attorney, his possession of this exculpatory information. However, Mr. Galison also added that he was prohibited from revealing the information, as it was subject to the attorney-client privilege between the late Dennis Carney and himself.
*687 As a result of the aforementioned, Mr. Liotti moved by order to show cause to compel Mr. Galison to reveal his conversation with Carney and any notes in his possession, which allegedly contain the exculpatory material. Due to the factual issues presented, a hearing was held before the court. (People v Bogle, 100 AD2d 762 [1st Dept 1984].)
At the hearing, one witness, Edward Galison, was called. In his testimony, Mr. Galison said the Carney case was referred to him from another attorney, the late Charles Chassen. Mr. Galison represented Carney throughout the proceedings, until the conclusion of the case, which resulted in a dismissal of the grand jury indictment in 1980.
Mr. Galison testified that when he became aware of the charges against Vespucci in late 2001, he was directed by a Supreme Court justice to seek the advice of Roy Simon, a Hofstra University law professor with an expertise in ethics. Professor Simon advised Mr. Galison to obtain an opinion from the Nassau County Bar Association Committee on Professional Ethics. Mr. Galison testified that he was advised by the committee to notify both the Assistant District Attorney and Vespucci’s defense attorney that he possessed exculpatory material, but that he was prohibited by attorney-client privilege from revealing the information, unless it was the result of a direct order of the court.
There is no indication that the communication is anything except governed by attorney-client privilege. The transcript does not indicate the presence of any unnecessary individuals during the conversation between Mr. Galison and Mr. Carney. Indeed, the conversation occurred at Mr. Galison’s office while he was in the midst of his law practice.
Following the hearing, defense counsel submitted memoranda of law. The Assistant District Attorney submitted an affirmation and the defense attorney filed a reply affirmation.
Significantly, the defense has attached an affidavit of one Doreen Ferranti, who had a child with Dennis Carney in 1986. She described how Carney had severely battered her during the course of their relationship. She claimed they lived together from 1982 to 1991 in Nassau County, New York. She claimed to have a common-law marriage, a concept not recognized in New York State.
During this period of time, Ms. Ferranti was severely beaten and abused by Carney. The defendant, Vespucci, was ridiculed by Carney as a “pussy, a punk and a junkie” and he, himself, *688 took credit for killing Hogan. According to Ms. Ferranti, Carney said “I iced him, I did it once and got away with it and I can do it again and get away with it.” He joked about the murder and referred to it as “Pulling a Hogan” in reference to a possible murder and getting away with the consequences.
In December 1991, Ms. Ferranti and her daughter were hiding from Carney. At that time, Carney broke into Ms. Ferranti’s parent’s house and killed her father and her brother. Carney then immediately turned the gun on himself and died as well.
Based upon the aforementioned, the court is now charged to determine to what extent the court should order the attorney-client privilege be pierced, or should the court uphold the privilege and continue it intact and undisturbed?
II. The Law
The attorney-client privilege is perhaps the oldest of such evidentiary exceptions (Hunt v Blackburn, 128 US 464 [1888].) Established in the sixteenth century, the privilege was originally based on the code of honor of the barrister and solicitor. (Bead v Lovelace, 21 Eng Rep 33 [1577].) It was designed to foster “the open dialogue between lawyer and client that is deemed essential to effective representation” (Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 377 [1991].) There is a reasonable expectation that such statements are being made in complete confidence. (People v Osorio, 75 NY2d 80 [1989].) The privilege is intended to encourage “full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.” (Upjohn Co. v United States, 449 US 383, 389 [1981].) However, as is the case with all privileges, it is also an impediment to the truth seeking process, in that it denies factfinders access to information of material relevance.
Due to this limitation of access to information, any codification of the attorney-client privilege is to be strictly construed. (Madden v Creative Servs., 84 NY2d 738 [1995].)
The New York statute’ establishing attorney-client privilege can be found under CPLR 4503 (a). This statute is applicable to criminal actions. (CPL 60.10; People v Dixon, 204 AD2d 234 [1st Dept 1994].)
The statute reads as follows:
“§ 4503 Attorney.
“(a) Confidential communication privileged; non *689 judicial proceedings. Unless the client waives the privilege, an attorney or his employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, nor shall the client be compelled to disclose such communication, in any action, disciplinary trial or hearing, or administrative action, proceeding or hearing conducted by or on behalf of any state, municipal or local governmental agency or by the legislature or any committee or body thereof. Evidence of any such communication obtained by any such person, and evidence resulting therefrom, shall not be disclosed by any state, municipal or local governmental agency or by the legislature or any committee or body thereof. The relationship of an attorney and client shall exist between a professional service corporation organized under article fifteen of the business corporation law to practice as an attorney and counselor-at-law and the clients to whom it renders legal services.”
The case at bar clearly presents a situation where the attorney-client privilege is in full force and effect. The court agrees with the earlier conclusions of the Nassau County Bar Association that the communications between Mr. Galison and the late Dennis Carney are confidential and involved sensitive statements involving the serious offense of murder. As such, Mr. Galison cannot voluntarily divulge the information being sought by defendant Vespucci. The information can only be released by a court order. (People v Hune, 168 Misc 2d 466 [Sup Ct, NY County 1995].)
Therefore, the remaining question that should be asked by the court is “under the circumstances in the case at bar, do appropriate circumstances exist to pierce the attorney-client privilege established between Mr. Galison and the late Dennis Carney?” The following discussion will analyze this unique issue, unprecedented under New York statute and case law. „
There are no generally accepted guidelines for attorneys where their clients have died and the attorney-client privilege affects the release of material evidence. On a national level, there appears to be five different approaches to this particular situation.
*690 The first theory allows for the privilege to be passed down like property to one’s heirs, who become joint successor holders. (Walton v Van Camp, 283 SW2d 493 [Mo 1955].) Popular in the midwest, the position is that some persons might be deterred from disclosure had they known that what they said could be revealed after their death to the embarrassment of their own reputations and in the interests of their survivors. (Buuck v Kruckeberg, 121 Ind App 262, 95 NE2d 304 [1950]; State v McDermott, 79 Ohio App 3d 772, 607 NE2d 1164 [1992]; Mayberry v State, 670 NE2d 1262 [Ind 1996].)
A second view is that the privilege temporarily survives and it ceases to exist when the client’s estate is finally distributed and his personal representative (executive or administrator) is discharged (see Cal Evid Code § 954; Colo L Rev Comm on Courts; Or Evid Code rule 503 [3]). This west coast approach limits the duration of the privilege. It is established by statute and enables the personal representative to use the privilege in the same manner as the deceased holder, with no need to establish any affirmative showing to exert it. (Rittenhouse v Superior Ct., 235 Cal App 3d 1584, 1 Cal Rptr 2d 595 [1991].)
The third viewpoint is that the privilege ceases upon the death of the original holder (see 1 Imwinkelried, New Wigmore: A Treatise on Evidence § 6.5.2 [2002]). This is the extreme minority viewpoint and usually makes its appearance in dissenting opinions (see Swidler & Berlin v United States, 524 US 399, 411 [1998] [O’Connor, J., dissenting]; Matter of John Doe Grand Jury Investigation, 408 Mass 480, 486, 562 NE2d 69, 72 [1990] [Nolan, J., dissenting]). However, this approach follows the general bias against the use of privileges, and recommends the courts resist both the creation of new privileges and the expansion of interpretations of existing privileges. (Swidler & Berlin, supra at 415 [O’Connor, J., dissenting].) Indeed, it is a valid question as to whether or not the client, when discussing his case with his attorney, has any concern of the use of the information after he has died and is more likely concerned with his immediate situation.
While courts have chosen not to embrace the end of the privilege when the client dies, it will allow the privilege to terminate when the client is an expired corporation. It is limited to situations where the assets are sold and the company is not absorbed into a new corporate entity. (Ramada Franchise Sys. v Hotel of Gainesville Assoc., 988 F Supp 1460 [ND Ga 1997].) Only time will tell if this theory will be expanded further. (Sobol v E.P. Dutton, Inc., 112 FRD 99 [SD NY 1986].)
*691 The fourth theory is the exact opposite of the third approach, and considers the attorney-client privilege as absolute. Some courts have held that “(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at [t]his instance permanently protected (7) from disclosure by himself or by his legal advisor.” (State v Doster, 276 SC 647, 651, 284 SE2d 218, 220 [1981], citing 8 Wigmore, Evidence § 2292 [1961].)
The key ruling endorsing the “absolute privilege” approach was the United States Supreme Court decision in Swidler & Berlin v United States (524 US 399 [1998]). The Court rejected moderate approaches, and reasoned that if clients expect confidentiality, which they are clearly entitled to, then any standard less than absolute privilege is unacceptable. The facts in Swidler & Berlin involved the death of White House Counsel Vincent W. Foster, Jr., during the special investigation of the firing of employees in the White House travel office. Shortly before his death, Foster had spoken to an attorney, and it was this attorney’s notes that the Special Prosecutor sought to be subpoenaed. In outright prohibiting the disclosure of the notes, based upon attorney-client privilege, the Court stated:
“Despite the scholarly criticism, we think there are weighty reasons that counsel in favor of posthumous application. Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. While the fear of disclosure, and the consequent withholding of information from counsel, may be reduced if disclosure is limited to posthumous disclosure in a criminal context, it seems unreasonable to assume that it vanishes altogether. Clients may be concerned about reputation, civil liability, or possible harm to friends or family. Posthumous disclosure of such communications may be as feared as disclosure during the client’s lifetime.” (Swidler, supra at 407.)
While the absolute privilege of Swidler & Berlin continued in federal court, state courts are still open to their own interpretation. The absolute privilege approach can produce what some may view as harsh results. In State v Macumber (112 Ariz 569, 544 P2d 1084 [1976]), a factual situation was presented that is quite similar to the case at bar. In Macumber, the absolute privilege doctrine was applied to a situation *692 where two attorneys were willing to testify that a deceased client had admitted to the murder that had been charged against the defendant. The Arizona court prohibited this testimony based upon attorney-client privilege, holding that “the privilege does not terminate at death” and an “attorney is not allowed to waive the privilege.” (Macumber, 112 Ariz at 571, 544 P2d at 1086.)
The fifth and final view is what could be referred to as a compromise or “balancing of interests” approach. This was the opinion of the United States Court of Appeals in In re Sealed Case (124 F3d 230 [DC Cir 1997], revd sub nom. Swidler & Berlin v United States, 524 US 399 [1998]). Here the District of Columbia Court of Appeals ruled that upon the death of the original holder, the absolute privilege expires and converts into a conditional privilege, at least when it falls “within the discrete zone of criminal litigation” (Sealed Case at 234). In such a situation, even if there is a prima facie case for applying the privilege, the trial judge could surmount the privilege if he or she balanced the factors and found a compelling case— specific need for the relevance of the privileged information.
Many states have adopted various forms of the balancing test. The landmark decision of Cohen v Jenkintown Cab Co. (238 Pa Super 456, 357 A2d 689 [1976]) set the standard that is generally followed by most jurisdictions. According to Cohen, in deciding whether to sustain or overrule the privilege, a judge may consider such factors as (1) the import the disclosure would have had on the client’s daily life, (2) whether the disclosure would likely lead to liability for the client or his estate, (3) whether disclosure would blacken the memory of the deceased client, and (4) the need for the testimony must be clearly established by the moving party. (Cohen, supra, 238 Pa Super at 461-464, 357 A2d at 692-694.)
Therefore, as there is no controlling New York Court of Appeals ruling on this subject, this court must select and evaluate which appropriate viewpoints are useful to evaluate this case.
III. Discussion
After reviewing the above case law, it appears that New York has not considered the first three approaches. However, some courts have applied the fourth (absolute privilege) and fifth (balancing test) approaches. We will now discuss these theories as applied to New York law.
The “absolute privilege” approach advocated by the Supreme Court in Swidler & Berlin v United States (524 US 399 [1998]) *693 seems to have a long history in New York State. Early rulings by Surrogate’s Courts have held there is no power to waive the privilege of nondisclosure by an attorney of communication to him by a deceased client. (Matter of Williams, 179 Misc 805 [1942].) One Surrogate’s Court had gone so far as to rule that the power to waive the attorney-client privilege ends at the death of the client and is thereafter irrevokable. (Matter of Alexander, 205 Misc 894 [1954].)
The Assistant District Attorney cites People v Modzelewski (203 AD2d 594 [2d Dept 1994]) in support of the “absolute privilege” theory. In Modzelewski, the trial judge barred the testimony of the attorney of the coperpetrator, alleging exculpating the defendant, “on the basis that any communication in this vein was protected by the ‘attorney-client privilege’, belonging solely to the coperpetrator, and the right to waive such privilege had ceased upon the coperpetrator’s death.” (Id.) However, as defense counsel points out, the ruling on appeal was limited to the defendant’s insufficient offer of proof. Nevertheless, although no final ruling was made in Modzelewski, it is apparent from the available cases that the absolute privilege is a theory that is viable in New York.
Therefore, if one applies the absolute privilege interpretation to the case at bar, Mr. Galison is prohibited from releasing the information in his possession concerning notes and conversations with Dennis Carney, under the doctrine of attorney-client confidentiality.
The court will now turn its attention to the “balancing test” approach.
As stated earlier, the balancing test approach weighs the need of piercing of the veil of attorney-client privilege against the strong policy in favor of the attorney-client confidence. (Cohen v Jenkintown Cab Co., 238 Pa Super 456, 357 A2d 689 [1976]; In re Sealed Case, 124 F3d 230 [DC Cir 1997], revd sub nom. Swidler & Berlin v United States, 524 US 399 [1998].)
As with the “absolute privilege” approach, the “balancing test” has few New York case citings. However, one case that deserves attention is the Appellate Division’s ruling in People v Belge (50 AD2d 1088 [4th Dept 1975]). In Belge, the Court questioned the absolute privilege doctrine in a case where the attorney was representing a defendant charged under the Public Health Law for violating the rights of burial and failure to give notice of death. While recognizing the attorney-client privilege shielded the attorney from liability in the case, the Court noted “In view of the fact that the claim of absolute privilege *694 was proffered, we note that the privilege is not all-encompassing and that in a given case there may be conflicting considerations. We believe that an attorney must protect his client’s interests, but also must observe basic human standards of decency, having due regard to the need that the legal system accord justice to the interests of society and its individual members.” (Id. at 1088.)
Like the Second Department’s discussion of absolute privilege under Modzelewski, the Fourth Department in Beige could not reach the issue since the question before it was limited to the sufficiency of the indictment. However, it can be gleaned from the decision that the privilege was not designed to thwart “justice to the interests of society and its individual members.”
In applying Belge, and the more developed balancing test stated in Cohen (supra), the court must look at (1) the impact it would have had on the defendant’s daily life, (2) liability to a client’s family, (3) blackening the memory of the deceased, and (4) the need for the testimony must be clearly established. (Cohen, supra at 694.)
In examining the Beige/Cohen factors, it is clear a connection to the murder would have affected the defendant’s life and could subsequently create some potential liability for his estate, if indeed one exists. As for blackening the reputation of the alleged perpetrator Carney, his death in 1991 was a suicide committed after he killed two innocent people. The status of Mr. Carney’s reputation was in question at the time of his death.
However, it is the fourth factor, “where the moving party must establish the need for the testimony,” which is the most difficult obstacle for defense counsel. As stated earlier, defense counsel has provided an affidavit of Doreen Ferranti, former common-law wife of Carney, who describes in detail statements he made exculpating his responsibility for the murder of Hogan and marginalizing the role of defendant Vespucci. Therefore, since such information is readily available, the necessity of breaking the attorney-client privilege takes on considerably less importance. Thus, as the exculpatory information can be presented in any event, the need to disturb the strong public policy in favor of attorney-client privilege has been obviated.
Another consideration that must be taken into account is the issue of admissibility. Clearly, the statements of Carney to both Ms. Ferranti and Mr. Galison are both hearsay. (Nucci v Proper, 95 NY2d 597 [2001].) However, the statements made to Ms. Ferranti could arguably qualify as a declaration against penal interest. (People v Settles, 46 NY2d 154 [1978].) This is *695 particularly appropriate in the case at bar, as Carney could have been reindicted on the matter (CPL 210.45). Due to the fact Ms. Ferranti and Mr. Carney only had a “common law marriage” there is no marital privilege that would bar disclosure. (People v Suarez, 148 Misc 2d 95 [Sup Ct, NY County 1990].) However, an attempt to admit into evidence any statements by attorney Ed Galison about Carney’s role in the murder would clearly be hearsay and not fit into the exception of a declaration against penal interest. As all clients believe at the time they are confiding with their attorney, there can be no fear of discovery, as the confidential relationship “exists to ensure that one seeking legal advice will be able to confide fully and freely in his [or her] attorney, secure in the knowledge that his [or her] confidences will not later be exposed to public view to his [or her] embarrassment or legal detriment.” (People v Cassas, 84 NY2d 718, 723 [1995]; Matter of Priest v Hennessy, 51 NY2d 62, 67-68 [1980].) Thus, the declarant is unaware that any statement would be against his personal interest because of his belief it could not be used against him.
Therefore, even if the court were to pierce the veil of attorney-client privilege, the statements would, in all likelihood, be denied admittance at trial under the established rules of evidence.
IV. Conclusion
Upon review of the appropriate case law and statutes, this court concludes that the potential testimony of attorney Edward Galison and his notes concerning statements made to him by the late Dennis Carney are privileged and will not be made available for discovery, either under the “Absolute Privilege” or “Balancing Test” doctrine. Accordingly, defendant’s application for a court order is denied in its entirety.