Filed 4/11/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FRED MARION CAIN III,<br><br>        Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SOLANO,<br><br>        Respondent;<br><br>THE PEOPLE,<br><br>        Real Party in Interest. | A170052<br><br>(Solano County Super. Ct. No. F23-01357) |

After petitioner Fred Marion Cain III was charged with the 1987 kidnapping, sexual assault, and murder of a six-year-old child, the Solano County Public Defender's Office (Public Defender's Office) was appointed as Cain's counsel.  The People (real party in interest) moved to recuse the Public Defender's Office, alleging a conflict of interest resulting from that office's previous representation of the late Shawn Melton, who was tried twice for the same 1987 murder, resulting in two mistrials and the eventual dismissal of the case against Melton.  Respondent court granted the motion and Cain filed the instant petition for extraordinary relief from that order.  Because no conflict of interest currently exists, we grant Cain's petition for a writ of mandate.

1

# BACKGROUND

## *Factual Summary*

In 1987, Peter Foor was the deputy public defender who represented Melton in two trials for the same murder with which Cain is now charged. The following year, the charges were dismissed against Melton by the trial court after two juries failed to reach a unanimous verdict. After the dismissal of the case against Melton, DNA testing excluded Melton as a contributor to the samples taken from the victim's body. However, the same DNA testing established Cain as a contributor to the sample. Cain was subsequently charged with the kidnapping, sexual assault, and murder of the child. Foor was appointed to the bench in 1997 and is now retired.[1] Melton is deceased.

## *Cain's Arraignment*

At the time of Cain's arraignment, the assigned deputy public defender told the arraignment judge that his office had reviewed the discovery and determined that there was no conflict, and they would accept the appointment to represent him. The deputy public defender informed the judge that Foor, Melton's former attorney, had no connection with the current Solano County Public Defender's Office, had subsequently been a judge for over 20 years, and was now retired. Counsel informed the court that the Public Defender's Office did not have any physical files from the prior representation of Melton and the clerical staff had done its due diligence and determined that there were no conflicts with the representation of Cain.

The People remained concerned about the public defender's representation of Cain based on the prior representation of Melton. They argued that the only defense for Cain would be a third-party culpability

---

[1] We refer to retired Judge Peter Foor as Foor to avoid any confusion with his role in this case as the assigned deputy public defender for Melton. No disrespect is intended.

allegation against Melton, the former client whom the public defender had represented during the two prior prosecutions. The People also expressed a concern about the public perception of the Public Defender's Office now representing Cain for the same charges that it defended Melton against, and that there was no harm in appointing an alternate counsel qualified to handle capital cases. The court felt the matter should be decided by formal motion and did not rule on the potential conflict. Instead, it arraigned Cain and assigned the case to a trial court.

### *Trial Court Briefing*

Subsequent to the arraignment, the People brought their formal motion to recuse the Public Defender's Office. In the motion, the People argued that "an irreconcilable conflict of interest" arose from the public defender's successive representation of Melton and Cain. According to the People, "[t]he Public Defender's conflict places her duty of confidentiality to . . . Melton in opposition to her duty to provide effective assistance of counsel to" Cain. In support of this position, the People submitted an email exchange between District Attorney Krishna Abrams and Public Defender Elena D'Agustino in which Abrams stated his understanding from Foor that there were "6 boxes" concerning the Melton case in the public defender's possession. Abrams expressed the view to D'Agustino that there was "an outside chance" the People might "need to call . . . Foor in the case." Abrams did not explain why testimony from Foor might be needed, or what information might have to be elicited from Foor.

Since Melton and Cain faced the same charges, the People argued that it should be presumed confidential information was shared during the representation of Melton which would be material to the representation of Cain in light of the third-party culpability defense. In their motion, the

3

People conceded the attorney-client privilege and the duty of confidentiality survived the death of Melton; therefore, Melton's former attorney, Foor, was constrained by the privilege and bound by the ethical duty to maintain the confidences of Melton. Nevertheless, the People concluded that there remains a conflict of interest by expressing their concern with the "preservation of the public trust in the scrupulous administration of justice and in the integrity of the bar" over defendant's choice of counsel.

In response, the public defender filed an opposition, along with an affidavit denying that the office currently possesses any confidential information from Melton and stating that all of its current employees began working for the Public Defender's Office after its representation of Melton had concluded. Neither Melton's name nor his case number appeared in the Solano County Public Defender's case management system. The public defender explained that she did not have possession of any confidential information or documents related to Melton. The public defender also did not find any ethical concerns under either California State Bar Rules of Professional Conduct, rule 1.9 or rule 1.10, with its current representation of Cain based on its former representation of Melton. The public defender relied on *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566 (*Rhaburn*), for the proposition that an automatic rule of vicarious disqualification should not apply in cases of public law offices, and when applying the factors to be considered as set forth in *Rhaburn* to the current representation there was no conflict of interest warranting disqualification.

At the first hearing on the motion, the People conceded that the public defender did a diligent search for Melton's records, including the missing six boxes, and was unable to find those boxes or any other relevant records. Respondent court also accepted the representations of the public defender in

4

her declaration in support of the opposition to the motion to recuse. Nevertheless, the People and respondent court expressed concern that the public defender would attempt to implicate Melton in the crimes charged against Cain, that the six boxes or other confidential information could show up in the future, and that the successive representation would raise concerns of public confidence in the Public Defender's Office. Respondent court opined that the public defender could not "[e]thically . . . subpoena . . . Foor in to testify about" confidential communications from Melton, but a "different law firm could." When the deputy public defender replied that Foor would be ethically bound to maintain Melton's confidence, the court began its inquiry into whether the attorney-client privilege terminates upon the death of the client. Accordingly, the court solicited supplemental briefing on that issue and whether a waiver from Cain was required.

In its supplemental briefing, the public defender argued that the attorney-client privilege survived Melton's death. She also noted that since the conclusion of Melton's representation in 1988, the Public Defender's Office has seen "a complete turnover of staff" and has been "reorganized." Before the 1989 reorganization, "the Solano County Public Defender operated under a split system" of a Fairfield office and a Vallejo office, each with its own leadership. After the reorganization, the two offices were consolidated into a unitary Solano County office led by a single public defender. The public defender reiterated that there was no conflict of interest because no employee from the current Solano County Public Defender's Office was directly involved with Foor or Melton during the prior representation. She argued that since there is no conflict, no waiver is required from Cain. The People's supplemental briefing did not address the privilege issue, but rather,

5

reiterated the People's concern regarding the missing six boxes from the Melton case.

The second hearing on the disqualification motion focused principally on whether the attorney-client privilege survived Melton's death. In the words of respondent court, "[m]y only issue is this single issue about the privilege. And the fact that . . . a very strong argument exists that the privilege expired with . . . Melton's death 24 years ago . . . ." In "this particular case, . . . not being able to go to the mat and . . . tell . . . Foor, 'I think the attorney-client privilege died when . . . Melton died,' . . . is a problem for the Public Defender's Office."

After the Public Defender submitted further briefing responding to respondent court's concern, a third hearing was held. At that hearing, the court granted the disqualification motion, finding that "an issue exists with whether or not . . . Foor . . . would have a duty to invoke the attorney client privilege" if his testimony were sought. According to respondent court, "it might not be to . . . Cain's advantage to advocate [the] position" that Foor would have that duty. Thus, the Public Defender's Office was disqualified not on the grounds suggested by the district attorney's motion, but for the public defender's stated positions respecting the attorney-client privilege and the attorney's duty of confidentiality. Cain filed this petition for writ of mandate.

### Writ of Mandate

After Cain filed the instant petition, we solicited briefing related to the questions of whether the attorney-client privilege or the duty of confidentiality survives a client's death, and whether those considerations furnished a proper basis for granting the disqualification motion. In turn, we received the district attorney's informal opposition to Cain's petition, Cain's

6

reply to that opposition, letter briefs from the Attorney General and the State Public Defender, and an *amicus curiae* brief filed jointly by the California Association of Public Defenders and the Alameda County Public Defender. We then issued an alternative writ of mandate, observing that the duty of confidentiality prohibits Foor from voluntarily disclosing any information he received from Melton, and that even assuming Foor could be *compelled* to testify on that subject, there was no basis to disqualify the Public Defender's Office simply because it did not represent that it was willing to adopt the "risky strategy" of seeking his compelled testimony with no way of knowing in advance what he would say.

### *Return*

In response to the alternative writ, respondent court filed a return. The court determined that the attorney-client privilege did not survive the death of Melton and that there is no implied evidentiary privilege attached to the duty of confidentiality. It recognized, however, that "whether or not . . . Melton's attorney-client privilege continues to exist posthumously, or whether the duty of confidentiality fills in the gap once the privilege expires, is not the determinative issue to this motion to disqualify." The court concluded that the "policy" determination of the Public Defender's Office not to pursue discovery from Foor based on its purportedly mistaken belief that it ethically could not do so requires its disqualification.[2] Petitioner submitted a reply to respondent court's return, and the People elected to treat their informal opposition as their return.

---

[2] Respondent court also expressed concern that while Cain indicated a desire to be represented by the Public Defender's Office, he has refused to waive any conflict or have independent counsel appointed to discuss the right to conflict-free counsel.

7

## DISCUSSION

Cain argues that respondent court erred in granting the People's motion to recuse the Public Defender's Office because there is no conflict of interest relevant to that office's representation of Cain. We agree.

### I. Standard of Review

Mandate is an appropriate method to seek review of "[o]rders concerning the designation or substitution of appointed counsel . . . ." (*Drumgo v. Superior Court of Marin County* (1973) 8 Cal.3d 930, 933.) Indeed, "a promptly filed writ petition normally provides the only effective remedy for an erroneous replacement of appointed counsel because of a potential conflict of interest." (*People v. Noriega* (2010) 48 Cal.4th 517, 525, fn. 1.)

A challenge to a trial court's disqualification of counsel is reviewed for abuse of discretion. (*Rhaburn, supra*, 140 Cal.App.4th at p. 1573.) "The party resisting disqualification bears the burden of establishing the facts making disqualification inappropriate, and we 'accept[] as correct all of [the trial court's] express or implied findings supported by substantial evidence.' " (*Ibid.*) However, "[t]he abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712; *People v. Thai* (2023) 90 Cal.App.5th 427, 433; *People v. Smyth* (2024) 99 Cal.App.5th 22, 27.)

The California Supreme Court has definitively held that "[a] defendant who requires appointed counsel does not have a constitutional right to a counsel of choice"; as such, there is no per se violation of the federal or state

8

constitutional rights of the defendant simply because a trial court orders the removal of appointed counsel over defendant's objection. (*People v. Thomas* (2012) 54 Cal.4th 908, 924; *People v. Clark* (2011) 52 Cal.4th 856, 994, fn. 41, ["a defendant has no right to appointed counsel of choice, under the . . . Sixth Amendment, or any other constitutional guarantee"].) Instead, the trial court has discretion to remove counsel " 'to eliminate potential conflicts, ensure adequate representation, or prevent substantial impairment of court proceedings . . . .' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1187; *People v. Panah* (2005) 35 Cal.4th 395, 426; *People v. Mungia* (2008) 44 Cal.4th 1101, 1119); nevertheless, the proper exercise of discretion will also include consideration of whether a defendant's choice of counsel can be reasonably accommodated under the circumstances. (*People v. Woodruff* (2018) 5 Cal.5th 697, 728–729); *Sanchez v. Superior Court* (2024) 106 Cal.App.5th 617, 627 (*Sanchez*).)

## II. There Is No Conflict of Interest

At the outset, we note that the caselaw recognizes two principal ways in which a conflict of interest might arguably arise in circumstances like Cain's. First, any extant "duty of loyalty to" former client Melton could "potentially . . . hamper[] [counsel's] performance as" Cain's "counsel, such as by causing him to 'pull his punches' " with respect to Melton. (*People v. Lawley* (2002) 27 Cal.4th 102, 146.) Second, Cain's counsel might have in his possession "confidential information" that was "obtained from" former client Melton and could be used in turn against Melton. (*Vangsness v. Superior Court* (1984) 159 Cal.App.3d 1087, 1090 (*Vangsness*).) A third possibility, raised by respondent court here, infers a potential conflict of interest from the public defender's position that she would be ethically barred from seeking the disclosure of confidential communications between Melton and Foor. We

9

conclude that there is no substantial evidence of an actual or potential conflict of interest—at least not one grounded in anything more than speculation—in any of these respects.

### *A. No Evidence Cain's Counsel Will Pull His Punches*

We reject outright the notion that the current assigned deputy public defender would "pull his punches" with respect to Melton; "the record shows this is simply not going to happen." (*Vangsness, supra*, 159 Cal.App.3d at p. 1091, fn. 3.) Cain's counsel averred that he "intend[s] . . . to point the finger at . . . Melton." And respondent court later told Cain's counsel: "I don't think, . . . in my experience you have ever pulled punches at anything." Rather, respondent court's "only issue" with counsel's representation of Cain was "this single issue about the" attorney-client "privilege" concerning confidential communications.[3] We see no pulling of punches.

Accordingly, our primary concern under the existing caselaw is a potential conflict of interest related to Cain's current deputy public defender wrongfully obtaining confidential information that was presumably relayed to Foor by Melton. As we explain below, there is no substantial evidence in the record that the Public Defender's Office is in possession of such information or that there is any reasonable possibility that Cain's deputy public defender would come into such possession. Moreover, there is no evidence that the office of the public defender's previous relationship with Melton has anything to do with its reasoned position that its ethical obligations prohibit the office from enticing Foor to breach his duty of confidentiality.

---

[3] Moreover, no party has argued that Cain's counsel, or the office of the public defender generally, has a duty of loyalty toward Melton that would prevent it from arguing that he committed the crime for which Cain is now being prosecuted.

10

### B. No Evidence Cain's Counsel is in Possession of Confidential Information Obtained from the Previous Representation of Melton

In *Rhaburn*, the court rejected the rigid presumption of vicarious disqualification in successive representations with adverse interests in the criminal law context for public entities such as the public defender's office. (*Rhaburn, supra*, 140 Cal.App.4th at 1571–1582.) *Rhaburn* held that in considering a motion to disqualify counsel related to confidential information presumably disclosed to counsel by a former client, "the trial court should evaluate the totality of the circumstances in determining whether there is a reasonable possibility that the individual attorney representing defendant either has obtained confidential information about the [former client] collected by his or her office, or may inadvertently acquire such information through file review, office conversation, or otherwise." (*Rhaburn*, at p. 1581.)

Here, there is no reasonable possibility of such an occurrence. Foor reportedly told the district attorney that the Public Defender's Office was "in possession of approximately 6 boxes on the Melton case," but when Foor represented Melton, Solano County's Public Defender services comprised two discrete offices—Fairfield and Vallejo—which were later consolidated into a unitary Solano County Public Defender's Office. As respondent court noted, a recent and "diligent search" was unable to locate those boxes, and "no person currently employed by the Solano County Public Defender's Office has any personal knowledge regarding" Melton. Under such circumstances, Foor's reported recollection of leaving six boxes with a significantly different Public Defender's Office, generations ago, does not constitute substantial evidence of a reasonable possibility that the current deputy public defender representing Cain might "inadvertently acquire [confidential] information" about Melton. (*Rhaburn, supra*, 140 Cal.App.4th at p. 1581.)

Furthermore, "in a case that does not involve 'direct and personal' representation of the [former client], the courts should normally be prepared to accept the representation of counsel, as an officer of the court, that he or she has not in fact come into possession of any confidential information acquired from the [former client] and will not seek to do so." (*Rhaburn, supra*, 140 Cal.App.4th at p. 1581.) Here, the Public Defender's Office has assured respondent court that its existing policies and procedures—including the creation of ethical walls, when necessary—should prevent any inadvertent acquisition of confidential information from the Melton case. We accept that representation.[4]

### C. There Is No Actual Conflict of Interest Based on the Public Defender's Decision Not to Seek Testimony from Foor

Nor is there substantial evidence of an actual conflict of interest relating to the public defender's decision in Cain's case not to seek the contents of Melton's confidential communications to Foor. We concluded in the alternative writ order that Foor's duty of confidentiality survived Melton's death, and we reiterate that conclusion here. As the Third Restatement of the Law Governing Lawyers instructs—and as both the Attorney General and the District Attorney concede—"[t]he duty of confidentiality continues so long as the lawyer possesses confidential client

---

[4] During the second hearing on the motion to recuse, respondent court made clear that it took no issue with the representations of the Public Defender's Office that they were not in possession of confidential materials from the Melton case, conducted a diligent search for the six boxes, have no current employees with personal knowledge regarding Melton, and have erected sufficient ethical walls to prevent inadvertent disclosure to Cain's current deputy public defender. The court stated, "I absolutely believe them." The district attorney similarly took no issue with the public defender's representations.

12

information," extending "beyond the end of the representation and beyond the death of the client." (Rest.3d Law Governing Lawyers, § 60.) We do not here find it necessary to reach the question of whether respondent court could compel Foor to testify, notwithstanding the survival of that duty. For present purposes it suffices to say that the duty prevents Foor from voluntarily disclosing anything he learned in confidence from Melton.

The public defender's determination that her office would be ethically precluded from seeking that information from Foor is not evidence of any conflict of interest. As the public defender explains in her reply, all deputy public defenders are " 'require[d] . . . to adhere to ethical duties as required by law and the State Bar Rules of Ethics.' " Those duties include rule 8.4 of the California Rules of Professional Conduct, which provides that "[i]t is professional misconduct for a lawyer to: [¶] . . . knowingly⁋ assist, solicit, or induce another to" violate "these rules or the State Bar Act." And in the public defender's view, asking Foor to disclose confidential communications from Melton would be inducing Foor to breach his own duty of confidentiality to Melton. (See Bus. & Prof. Code, § 6068, subd. (e)(1).)

Crucially, this ethical determination has nothing to do with Melton's status as a former public defender client, so it cannot be construed as a punch-pulling maneuver made on account of a conflict of interest arising from the public defender's successive representation of Melton and Cain; the same ethical reasoning would preclude the public defender from seeking confidential information from Foor even if Foor had represented Melton in private practice. On these facts, there is no reason to infer that the office of the public defender's previous representation of Melton would affect its conduct concerning confidential communications between Melton and Foor.

13

For the purpose of concluding that the Public Defender's Office has no conflict of interest resulting from its previous representation of Melton, the dispositive facts are that the office has determined that it is precluded from seeking to induce Foor to disclose confidential communications between him and Melton, that the rationale underlying that determination is eminently reasonable in the absence of any caselaw compelling a contrary conclusion, and that this rationale is wholly orthogonal to Melton's status as a former client.

In light of the foregoing, we conclude that disqualification is not required based on the public defender's decision not to seek Foor's compelled testimony. As the People conceded at oral argument, because the duty of confidentiality prevents Foor from voluntarily revealing what Melton told him, there is no way for the public defender, the alternate public defender, the district attorney, or any other lawyer in this case to obtain information from Foor before putting him on the stand to testify. Thus, even assuming that Foor's testimony could be compelled, on the present record it would not be ineffective assistance of counsel for the public defender to decline to seek it. As we explained in our order issuing the alternative writ of mandate, there is no reason to believe Cain's counsel "would be duty-bound to pursue [the] risky strategy" of seeking such information when it could not be known "in advance whether [it] would be damaging or helpful to . . . Cain's defense."[5]

---

[5] We do not mean to imply that there are no imaginable circumstances in which it could be ineffective assistance for Cain's counsel to fail to seek Foor's compelled testimony. Rather, our point is that no such circumstances presently exist and the possibility that they will arise in the future is highly speculative. In that context, the public defender's position that she will not seek Foor's compelled testimony does not furnish a basis for disqualification. We have no occasion to opine on a hypothetical situation that is not warranted by the present record.

14

We also see no basis for disqualification in the supposed "outside chance" that the People would "need to call . . . Foor in the case." This "outside chance" borders on non-existent because the People agree with the public defender that "Foor would not be at liberty to disclose what he learned when representing Mr. Melton." At oral argument, the assistant district attorney assigned to try the case stated rather emphatically that he has not asked Foor about his communications with Melton and does not plan to do so in the future. We also note that the record bears no indication that the Public Defender's Office would be in any way hampered or conflicted in how it would respond to an effort by the People to pursue discovery from Foor.

Even if the Public Defender's Office were not bound by the ethical constraints discussed above, there is no evidence in the record here to suggest that a decision by Cain's deputy public defender not to seek Foor's testimony would fall "below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.)[6] To the extent the Public Defender's Office attempted to obtain confidential information from Foor, Foor would be prohibited from voluntarily disclosing that information under Business and Professions Code section 6068, subdivision (e)(1). Even assuming Foor could be compelled to reveal confidential information from Melton subsequent to Melton's death, that does not mean that Foor could simply provide that information, without being compelled to do so, without running afoul of his ethical obligations under section 6068, subdivision (e)(1).

These ethical limitations inhibit the Public Defender's Office, or any other attorney, from obtaining useful information from Foor in defense of

---

[6] Accordingly, to whatever extent the trial court's return raises a concern about ineffective assistance of counsel that is separate from conflict-of-interest considerations, we conclude that such a concern is unsupported by the record.

15

Cain. Defense counsel would run the risk of not knowing prospectively what Foor might say on the stand. While it is generally ineffective assistance of counsel to fail to interview or investigate a potential witness (*In re Thomas* (2006) 37 Cal.4th 1249, 1258, quoting *In re Marquez* (1992) 1 Cal.4th 584, 602 [" '[B]efore counsel undertakes to act, or not to act, counsel must make a rational and informed decision on strategy and tactics founded upon adequate investigation and preparation.' "]), here the Public Defender's Office has presented a reasonable ethical basis for the decision not to attempt to investigate or interview Foor founded in the California Rules of Professional Conduct, rule 8.4(f), which forbids an attorney to "knowingly[] assist, solicit, or induce a . . . judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law."

Finally, from the perspective of the public defender, it could be a reasonable tactical decision not to call Foor to testify without knowing what he would say. There is other evidence that might raise a reasonable doubt as to Cain's guilt without any of the risks inherent to live testimony under such uncertain circumstances. For example, the People once believed beyond a reasonable doubt that Melton committed the murder. This can be shown by introducing Melton's docket into evidence along with the third-party culpability discovery already disclosed by the People to Cain, which apparently includes a confession by Melton. Both lines of evidence have the potential to be full-blown punches to the People's case against Cain—divorced from any conflict or risk of an unpredictable witness.

Consequently, we do not agree with respondent court that "the office's policy decision requires its disqualification." While a trial court has authority to remove appointed counsel over a defendant's wishes if it is necessary to do so to protect the defendant's constitutional rights to conflict-free counsel, it

16

should only do so where there is a clear conflict. (See, e.g., *People v. Baylis* (2006) 139 Cal.App.4th 1054, 1073 ["We conclude that where confronted with an *actual and substantial conflict of interest* involving counsel's duty of confidentiality to a former client, a trial court may exercise its discretion to disqualify the conflicted attorney absent an informed waiver from the former client." (Italics added.)].) Cain's current counsel has no direct or personal loyalty to Melton and has credibly expressed no motive to pull punches. Here, there simply is no conflict worthy of disqualification.

In this regard, our case is readily distinguishable from *People v. Jones* (2004) 33 Cal.4th 234, 239, where defense counsel was " 'very uneasy' " and found the relationship between his office and the third-party culprit " 'very troublesome' " and was concerned the personal lawsuit against him by the client might "cause him 'to flinch in this case.' " Similarly distinguishable is the recent decision in *Sanchez,* where the potential Racial Justice Act violation arose from the comments of Sanchez's assigned deputy public defender. (*Sanchez*, *supra*, 106 Cal.App.5th at pp. 624–626.) The *Sanchez* court concluded that it was not an abuse of discretion for the trial court to declare a conflict as to the assigned deputy public defender.[7] (*Id*. at p. 630.)

Our case is more in line with *Rhaburn*, where the deputy public defender expressed no personal loyalty to the witnesses and felt no constraint in investigating and pursuing the third-party defense. (*Rhaburn*, *supra*, 140 Cal.App.4th at p. 1580.) The *Rhaburn* approach to criminal conflicts applies equally to situations where the case involves representation of successive defendants in the same matter with interests that are adverse,

---

[7] It should be noted, the trial court in *Sanchez* disqualified the assigned deputy public defender, not the entire office—ordering another deputy public defender from the same office assigned to the case. (*Sanchez*, *supra*, 106 Cal.App.5th at p. 627, fn. 3.)

17

where the record, as it does here, establishes no direct or personal loyalty between the former client and current counsel, and sufficient barriers are established to ensure against inadvertent exposure of confidential information.[8]

### III. The Preservation of Public Trust Is Not Imperiled

Lastly, on the record reviewed here, the public defender's representation of Cain poses no risk to " 'the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.' " (*Rhaburn*, *supra*, 140 Cal.App.4th at p. 1573.) This is for three reasons. First, as we have already concluded, there is no substantial evidence of any conflict of interest on the part of the public defender, actual or potential.[9] Second, when compared to the office that represented Melton, the current Solano County Public Defender's Office reveals itself to be a substantially different entity, having gone through a significant reorganization and having no current employees who worked there when Melton was represented. Third, "point[ing] the finger at Melton" for the purpose of establishing a reasonable doubt as to Cain's guilt is entirely compatible with the proposition

---

[8] Since we conclude that there is no conflict of interest, we need not address the issue of waiver.

[9] Respondent court determined in part that disqualification was necessary due to the office of the public defender's "policy" that would ethically prohibit it from subpoenaing Foor to testify about confidential communications from Melton, concluding that a "different law firm could" and that this is "why we have an alternate defender's office." However, this is not how the alternate defender's offices should be used. They do not exist as a matter of mere convenience but rather out of conflictual necessity or unavailability. (Gov. Code, § 27706; Pen. Code, § 987.2; *Williams v. Superior Court* (1996) 46 Cal.App.4th 320, 326–329 ["Those statutes provide that a court must first utilize the services of the public defender in providing criminal defense services for indigent defendants, if the public defender is available to try the matter."].)

18

that the People attempted on two occasions to convict Melton of the same charges now pending against Cain.

Ultimately, Cain's expression of a willingness to continue with his current counsel whom he has formed a relationship with should be respected under the circumstances. (*Rhaburn, supra,* 140 Cal.App.4th at p. 1581.) Because no substantial evidence supports the findings underlying the determination that the Public Defender's Office should be disqualified,[10] Respondent court abused its discretion in granting the disqualification motion.

## DISPOSITION

Therefore, let a peremptory writ of mandate issue directing respondent court to vacate its order granting the motion to recuse the Public Defender's Office, and to enter a new order denying that motion.

HITE, J.[*]

We concur:

STREETER, Acting P. J.
GOLDMAN, J.

---

[10] As the Attorney General correctly pointed out at oral argument, prior to the filing of the Return, respondent court failed to adequately address *Rhaburn* in determining disqualification. In response to our alternative writ, respondent court addressed the factors in *Rhaburn*. Here, we do not find an abuse of discretion based on a failure to apply *Rhaburn*; rather, we find a lack of substantial evidence in the record to support respondent court's disqualification order.

[*] Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

STREETER, Acting P. J., concurring

In this "cold case" murder prosecution, we decide two related questions that turn on the ethical responsibilities of attorneys. The first, a familiar one in modern law practice, both public and private, is this: Should an entire law office be disqualified from representing a current client because of a past engagement someone in the office had for another client in a matter that bears a subject matter relationship to the current client engagement? Citing its paramount concern for preserving public trust in the scrupulous administration of justice and the integrity of the bar, the trial court ordered the disqualification of the Solano County Public Defender's Office (the Public Defender) in this case based on a representation that ended more than three decades ago of Shawn Melton, who now deceased. The lawyer who handled that matter, retired Judge Peter Foor, long ago left the Public Defender's Office and no longer practices law. All panelists agree that this remarkable disqualification order is erroneous. I concur fully in the holding, though I differ in some minor respects with my colleagues' reasoning.

The second, more difficult question—which arises because it is central to the trial court's rationale for ordering disqualification—is this: Following Foor's successful defense of Melton for a child murder in 1987, Melton's later death, and the recent filing of charges against Cain for the same murder, does Foor have a continuing duty to preserve the secrecy of confidential information acquired decades ago in the course of his defense of Melton? We all agree that the attorney-client privilege is no barrier to disclosure of Melton's secrets, since the privilege expires with a client's death. But at the same time, we also agree that an attorney's duty of confidentiality to a former client continues beyond the client's death. I would go further. Because of the breadth and near absolute nature of the attorney's statutory duty of

1

confidentiality under Business and Professions Code section 6068, subdivision (e), there is no possibility that Foor could end up being compelled to testify in this case. That prospect is chimerical, and to ensure the issue does not arise again at trial, I would say so more definitively.

## I.

Some preliminary context is important. To understand why the issues before us are framed as they are, and to see why there remains a potential that the theoretical conflict issue the trial court identified could become real at a future stage in these proceedings unless what we say here forestalls that possibility, it is helpful to review briefly how the parties' respective positions on the disqualification motion filed by the People evolved.

The trial court proceeded on the assumption that, at least arguably, Foor, as Melton's former attorney, "could be compelled to testify in judicial proceedings as to matters in which the attorney-client privilege has ceased to exist due to the death of his client." But compelled to testify at whose instance? The idea initially came from the People. In email correspondence with the Public Defender prior to the filing of a disqualification motion, District Attorney Krishna Abrams informed Chief Deputy Public Defender Oscar Bobrow that the People saw an "outside chance" they may need to call Foor to testify. About what exactly, Abrams did not say, but presumably to rebut any claim from Cain that Melton confessed to the killing. In response to Abrams's query whether the Public Defender would be withdrawing because of the prospect of Foor testifying, Public Defender Elena D'Augustino stated, "1. Mr. Melton is deceased. [¶] 2. No one who worked for the office at the time of trial currently works for the office. [And] [¶] 3. We are not in possession of a file or any confidential information with respect to Mr. Melton." Abrams replied that she understood from Foor that there were six

2

boxes of files relating to his defense of Melton in the possession of the Public Defender. At that point there was a stand-off.

Despite the insistence from the Public Defender that, decades after Foor's representation of Melton, Foor was no more than a stranger to the Public Defender and there was no trace of any confidential information Foor once acquired in the course of his work on behalf of Melton, the People moved for disqualification, arguing that, under *People v. Baylis* (2006) 139 Cal.App.4th 1054, there was a substantial subject matter relationship between the defense of Melton and the defense of Cain in successive matters. According to the People, the Public Defender was presumed to be in possession of all confidential information once known by Foor (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 (*SpeeDee Oil Change Systems*)), thus requiring its disqualification under the rule that knowledge possessed by any lawyer in a single office must be imputed to all other lawyers in the same office, even in circumstances where Melton, the client in the first representation, is dead, and Foor long ago left law practice. But the People's disqualification motion made no mention of any possibility they might wish to call Foor as a trial witness. By the time they filed the motion, their theory of disqualification had morphed into an argument centered on the attorney-client privilege.

Citing federal authority (*Swidler & Berlin v. U.S.* (1998) 524 U.S. 399 (*Swidler & Berlin*)), the People argued the Public Defender had a continuing duty to respect Melton's attorney-client privilege, and that, as a result, it had a conflict of interest because its ability to use all information at its disposal in defense of Cain—information which was presumed to include confidences conveyed by Melton to Foor—would be compromised. The Public Defender took no position on whether the attorney-client privilege survived Melton's

3

death, and instead argued that under *Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566 (*Rhaburn*), a "totality of the circumstance" test must be applied to determine whether the individual attorney representing [the] defendant either has obtained confidential information" or "may inadvertently acquire such information through file review, office conversation, or otherwise." Under *Rhaburn*, the Public Defender contended, there was no conflict of interest because "[i]t has been over 35 years since the prior representation; no attorneys who worked for the office at the time still work for the office; and there is no confidential information from the prior representation available to the current attorney."

In so arguing, the Public Defender confirmed that it did indeed intend to "point the finger" at Melton in its defense of Cain, but said the discovery already provided by the People—which includes a confession from Melton—gives it plenty of evidence on which to base that defense. To reinforce the point that it had no confidential information traceable to Melton and did not intend to seek any, the Public Defender added that, having consulted the State Bar Ethics Hotline, it concluded it was foreclosed from seeking information from Foor because, under applicable ethics rules, it had a continuing duty to respect Foor's duty to protect confidences he once acquired from Melton.

Presented with these opposing positions, the court ruled for the People. It disagreed that *Swidler & Berlin* applied, discounted the opinion the Public Defender received from the State Bar's Ethics Hotline because that opinion referenced *Swidler & Berlin*, and pointed out that under California law the attorney-client privilege disappears after the client dies. But the court ordered disqualification nonetheless, under its own rationale, not the one the People relied upon. Portraying the understanding of professional ethics held

4

by the Public Defender as a matter of "policy," the court concluded that, by voluntarily placing restrictions on the scope of its defense of Cain, the Public Defender was necessarily compromised and thus had a conflict of interest in representing him.

That was the posture of things when these writ proceedings came to us. We disagreed that disqualification was warranted, and by alternative writ invited the trial court to vacate its disqualification order under *Rhaburn*. Our alternative writ explained that the People's focus on the attorney-client privilege was misplaced, since an attorney's ethical duty of confidentiality under Business and Professions Code section 6068, subdivision (e)(1) and rule 1.6 of the California Rules of Professional Conduct is "broader than the attorney-client privilege, . . . is of indefinite duration, [and] continu[es] even after an attorney client relationship is over." As a result, we said, "Foor is categorically prohibited from voluntarily disclosing anything he learned through his representation of . . . Melton, and the Public Defender's Office does not have an obligation to . . . Cain that would require it to seek to induce . . . Foor to violate his ethical duties." We also pointed out that the prospect of the Public Defender needing compelled testimony from Foor was too remote and speculative to warrant disqualification. In a brief statement expressing my separate view, I stated it is "legally doubtful a court would have the power to compel testimony from . . . Foor, even in the unlikely event someone were to seek it."

On remand, the trial court adhered to its view that, by voluntarily electing not to pursue from Foor relevant, formerly attorney-client privileged information, the Public Defender must be disqualified. Its return distinguished *Rhaburn* as a case where the prior representation at issue—the representation of a third-party witness in a collateral matter—did not involve

5

engagement for clients with "directly adverse interests in the same matter in successive litigation." The court acknowledged an attorney's continuing duty of confidentiality to a former client, but reasoned that, "[l]ogically, when the attorney-client privilege ceases to exist . . . , the duty of confidentiality cannot fill the gap to create a new evidentiary privilege," since only the Legislature can create privileges. As for *Rhaburn*, the court concluded that "the ethical wall exceptions for a public entity legal office as described in *Rhaburn* [are] not controlling in this matter as recusal [is] necessary due to the policy decision not to pursue evidence from Mr. Foor."

## II.

We resolve this writ proceeding by rejecting the trial court's view that the Public Defender has an obligation to seek formerly attorney-client privileged information possessed by Foor and present any testimony from him that aids Cain's defense. But regardless of who might seek testimony from Foor, we must first answer a threshold question presented by the People's disqualification motion. Does the law, by legal fiction, *impute* to the Public Defender all confidential information once acquired by Foor from Melton, and if so, does that imputation mandate automatic disqualification, even in the absence of any showing that Foor actually remains in possession of client secrets, more than thirty years after his representation of Melton ended?

In our alternative writ, we cited *Rhaburn* and sought to draw the trial court's attention to the issue of vicarious disqualification, which was the legal basis of the People's disqualification motion as filed. The trial court addressed the issue in a footnote to its return, briefly discussing both *Rhaburn* and *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847–848 (*Cobra Solutions*). The court obliquely

6

suggested that *Rhaburn* is distinguishable, but in the end saw no need to consider disqualification by imputation because the "ethical wall exceptions for a public entity legal office as described in *Rhaburn* were not controlling in this matter," given the Public Defender's self-imposed constraints on the investigation it was willing to pursue on behalf of Cain.

Of the questions presented by this writ proceeding, the *Rhaburn* issue is the easiest. All three panelists agree that *Rhaburn* is controlling and that there is no "reasonable possibility" of anyone in the Public Defender obtaining confidential information from Foor about Melton—which is the correct conclusion, but it is only the bottom line to the *Rhaburn* framework of analysis. I would not only work through the *Rhaburn* analysis more fully, but would more clearly delineate, on the one hand, the threshold question of vicarious disqualification, and on the other hand, the related but separate question whether the Public Defender must be disqualified for conflict of interest because it might "pull its punches."

### A.

Stating things generally, disqualification motions arise in two factual circumstances: "(1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests." (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.) In simultaneous representation cases, "[t]he primary value at stake . . . is the attorney's duty—and the client's legitimate expectation—of *loyalty*." (*Flatt v. Superior* Court (1994) 9 Cal.4th 275, 284 (*Flatt*).) "[T]he rule is per se or automatic disqualification in all but a few cases" (*A.F. v. Jeffrey F.* (2022) 79 Cal.App.5th 737, 748, citing *Jessen v. Hartford Casualty Ins. Co.* (2003)

7

111 Cal.App.4th 698, 705 (*Jessen*)), as a prophylactic remedy imposed in the recognition that the attorney might be tempted to "exploit [an] unfair advantage" against the former client (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 308–309).

"In successive representation cases," by contrast, " 'the chief fiduciary value jeopardized is that of client *confidentiality.*' " (*In re Charlisse C., supra*, 45 Cal.4th at p. 159, quoting *Flatt, supra*, 9 Cal.4th at p. 283.)  In this setting, we apply what is known as the substantial relationship test.  "To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation.  [Citation.]  If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information." (*Cobra Solutions, supra*, 38 Cal.4th at p. 847, citing *Jessen, supra*, 111 Cal.App.4th at pp. 709, 710–711.)

The purpose of the direct and personal relationship element of the substantial relationship test is to assess whether " ' "it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible," ' " in which case " ' "the attorney's knowledge of confidential information is presumed." ' " (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1331 (*Adams*); see *Brand v. 20th Century Ins. Co./21st Century Ins. Co.* (2004) 124 Cal.App.4th 594, 607 [since attorney expert's "involvement in [a prior case] was direct and personal, and

8

the subjects of the two representations are substantially related, we conclude that the trial court abused its discretion in denying the motion to disqualify . . . and bar him from testifying against his former client in these proceedings"].)

In successive representation cases, it does not matter that the allegedly conflicted attorney denies knowledge or recollection of a past client's confidential information. A conclusive presumption of shared confidences between past and current representations arises where any attorney who had a direct and personal relationship with a former client later undertakes to represent a subsequent client with adverse interests to the former client on a matter that is substantially related by subject to the former client's engagement. (*Jessen, supra*, 111 Cal.App.4th at p. 709.) There are at least three sound reasons for this presumption. It avoids requiring the former client to prove what is in the attorney's mind; it "also avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge[,] and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest." (*H. F. Ahmanson & Co. v. Salomon Brothers., Inc.* (1991) 229 Cal.App.3d 1445, 1453.)

What is sometimes known as the doctrine of vicarious disqualification adds a layer of complication when the question arises whether confidential client information likely to have been acquired by an individual lawyer who had a direct and personal relationship with a former client should be imputed to other lawyers in the lawyer's law firm, tainting the entire firm. "Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.'"

9

(*Cobra Solutions*, *supra*, 38 Cal.4th at pp. 847–848.)  But because this form of imputation works by double attribution—first based on an attorney's presumed possession of a former client's secrets, and second by attribution of those secrets to every lawyer in any law firm or government law office the "tainted" attorney is affiliated with—it can lead to harsh results.

Over the years, most courts have moved away from automatic disqualification in double attribution cases.  (See e.g., *Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 806–814 (*Kirk*); *Adams*, *supra*, 86 Cal.App.4th at pp. 1337–1341.)  In considering whether the prophylactic remedy of automatic disqualification is warranted against an entire law office, most courts now recognize that, where the substantial relationship test is met in a double attribution case, it produces "not so much a conclusive presumption that confidential information has passed [but] a pragmatic recognition that the confidential information will work its way to the nontainted attorneys at some point." (*Goldberg v. Warner/Chappell Music, Inc.* (2005) 125 Cal.App.4th 752, 765.)  These courts treat "the presumption [as] a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case." (*Kirk*, at p. 801.)

Although the California Supreme Court has yet to address whether the presumption of shared confidences is rebuttable in the context of disqualification by officewide imputation (*Kirk*, *supra*, 183 Cal.App.4th at pp. 797–799), and as a result, the law on the point remains somewhat uncertain, one thing is clear.  Because the doctrine of vicarious disqualification applies much more flexibly when applied in the *public* law practice context than it does when applied to private firms (*Kirk*, *supra*, 183 Cal.App.4th at p. 805, fn. 24), "courts have more readily accepted the use

of screening procedures or ethical walls as an alternative to vicarious disqualification in cases involving public law offices." (*City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 25 (*City of Santa Barbara*); see *Kirk*, at pp. 805–806; *Castro v. Los Angeles County Bd. of Supervisors* (1991) 232 Cal.App.3d 1432, 1444–1445; *Chambers v. Superior Court* (1981) 121 Cal.App.3d 893, 897–903; *Chadwick v. Superior Court* (1980) 106 Cal.App.3d 108, 117 (*Chadwick*).)

*Rhaburn*—which was decided only a few days after *Cobra Solutions*,[11] the California Supreme Court's only vicarious disqualification case in the public law office context—is only the latest in the long line of cases going back to *Chadwick* forty-five years ago. The *Rhaburn* panel identified a number of considerations that justify a flexible approach to vicarious disqualification in the context of public law offices, and particularly public defender offices. Once the presumption of shared confidences arises, the panel explained, a "trial court should evaluate the totality of the circumstances in determining whether there is a reasonable possibility that the individual attorney representing defendant either *has* obtained confidential information about the [former client] collected by his or her office, *or* may inadvertently acquire such information through file review, office conversation, or otherwise." (*Rhaburn*, *supra*, 140 Cal.App.4th at p. 1581.)

The *Rhaburn* totality of the circumstances test exemplifies the prevailing, pragmatic approach to vicarious disqualification in public and private law practice cases, as applied in the unique setting of public defenders' offices. The *Rhaburn* court lists some general considerations that

[11] *Cobra Solutions* was decided on June 5, 2006; *Rhaburn* was decided on June 9, 2006; and given the nearly simultaneous timing of the opinions, naturally they do not refer to one another.

11

must always be borne in mind when applying this test, including that lawyers in public law offices are not motivated by the need to attract or retain new clients; that they tend to handle a high volume of cases (which lessens the temptation to misuse confidential information and diminishes the likelihood details will be recalled from case to case); that disqualification increases the cost of legal services delivered by public entities; and that—in criminal defense practice specifically—clients always have a particular interest in conflict-free counsel that is rooted in the Sixth Amendment. (*Rhaburn*, *supra*, 140 Cal.App.4th at pp. 1579–1580.) All of these factors, except possibly the last one, cut against taking a strict approach to vicarious disqualification in the public law office setting as a general matter.

As part of its totality of the circumstances test—the aspect of the test that is specifically tailored to the context of public defender offices—the *Rhaburn* court lists some case-specific factors that must be taken into account, holistically, on each record. These are "1) the length of time that has elapsed since the [prior representation] by the public defender's office; 2) the nature and notoriety (*vel non*) of the [case in which the prior representation took place]; 3) whether the current attorney was a member of the public defender's office at the time of the [former client's] case, and whether the attorney responsible for the [former client's] case remains with the office; [and] 4) the nature and extent of any measures or procedures established by the public defender to ensure that information acquired by one deputy in a previous case is made unavailable to the current attorney." (*Rhaburn*, *supra*, 140 Cal.App.4th at p. 1581.)[12]

---

[12] My colleagues appear to apply the "direct and personal relationship" test (see *Jessen, supra*, 111 Cal.App.4th at p. 709) to the assessment of whether, under *Rhaburn*, all lawyers in the allegedly conflicted public

Given the trial court's repeated citations *Cobra Solutions,* it is fair to ask whether *Rhaburn*'s totality of the circumstances test is still good law in light of that case. I believe the answer is clearly yes. *Cobra Solutions* does confirm that the automatic disqualification of an entire public law office by imputation is still necessary in some circumstances. But in that case, the allegedly "tainted" lawyer was a partner in a private law firm where he worked on a certain client's matter; he was then elected to be the city attorney of San Francisco, where he became the head of an office that was pursuing an enforcement action against the same client. Whether the city attorney in *Cobra Solutions* actually brought confidential information with him when he became city attorney did not matter, and the erection of an ethical wall within the city attorney's office made no difference.[13]

defender's office either have personally come into possession of client secrets some individual lawyer in the office learned in the course of a past representation of the client, or may come into possession of such secrets though "water cooler" conversations in the office. (Maj. opn. *ante*, at pp. 11–12.) This conflates two distinct steps in the analysis. *Jessen*'s "direct and personal relationship" test is relevant to whether the presumption of shared confidences applies at all in a successive relationship scenario (where the focus is on the past attorney client relationship). That is a different question than whether, under *Rhaburn*—which is a vicarious attribution case—presumptively shared confidences must be imputed to all lawyers in an allegedly conflicted office (where the focus is on the current attorney-client relationship). Because the whole point of vicarious imputation is to attribute presumptively shared confidences to attorneys who never had a direct and personal relationship with the former client, it makes no sense to make this a consideration under the *Rhaburn* totality of the circumstances test.

[13] "[T]he attorneys who serve directly under them cannot be entirely insulated from those policy decisions, nor can they be freed from real or perceived concerns as to what their boss wants. The power to review, hire, and fire is a potent one. Thus, a former client may legitimately question whether a government law office, now headed by the client's former counsel, has the unfair advantage of knowing the former client's confidential

Viewing *Cobra Solutions* from this perspective, *Rhaburn* fits comfortably in the line of vicarious disqualification cases where the fact that the tainted lawyer was in "managerial, supervisory and policy-making responsibilities in [a] public law office" can be the one singularly important consideration that makes a difference. (*City of Santa Barbara, supra,* 122 Cal.App.4th at p. 22.) It also illustrates the principle that, "if the tainted attorney was actually involved in the representation of the first client, and switches sides in the same case, no amount of screening will be sufficient, and the presumption of imputed knowledge is conclusive" (*Kirk, supra,* 183 Cal.App.4th at p. 814)—even in a public law office. Thus, what *Cobra Solutions* shows is that the doctrine of vicarious disqualification is alive and well in public law practice. But so is *Rhaburn*.

## B.

The trial court made no real effort to deal with *Rhaburn,* other than to observe that "no case appears to address the use of an ethical wall when the same legal office represents clients with directly adverse interests in the

---

information when it litigates against the client in a matter substantially related to the attorney's prior representation of that client. [¶] There is another reason to require the disqualification of the conflicted head of a government law office. That reason arises from a compelling societal interest in preserving the integrity of the office of a city attorney. It is beyond dispute that the citizens of a city are entitled to a city attorney's office that unreservedly represents the city's best interests when it undertakes litigation. Public perception that a city attorney and his deputies might be influenced by the city attorney's previous representation of the client, at the expense of the best interests of the city, would insidiously undermine public confidence in the integrity of municipal government and its city attorney's office." (*Cobra Solutions, supra,* 38 Cal.4th at pp. 853–854.)

14

same matter in successive litigation,"[14] and then to add that *Rhaburn* involved nothing more than a prior witness representation in an "unrelated matter." But these comments overlook the fact that *Rhaburn*'s totality of the circumstance test is a mode of rebutting the presumption of shared confidences which arises when there is a substantial relationship between a current representation and a past representation. If it had been material to the *Rhaburn* court that the prior representation at issue there was "in an unrelated matter," the analysis would have been complete at that point. There would have been no presumption of shared confidence, and nothing to rebut.

Applying the rules governing vicarious disqualification to the facts before us, there could be no clearer example of a successive representation scenario than this case, given the many years that have passed since Foor completed his defense of Melton, left law practice, and severed any professional relationship with the Public Defender. There is, to be sure, no

---

[14] The trial court's framing of the issue here appears to treat this case as if it belonged in the class of cases involving a simultaneous or dual representation situation, where there is a rule of per se disqualification. (See *Flatt*, supra, 9 Cal.4th at p. 284, fn. 3 ["The paradigmatic instance of . . . prohibited dual representation—one roundly condemned by courts and commentators alike—occurs where the attorney represents clients whose interests are *directly* adverse *in the same litigation.*" (Original italics.)]; see also *Cobra Solutions*, *supra*, 38 Cal.4th at p. 846 ["An attorney who seeks to simultaneously represent clients with directly adverse interests in the same litigation will be automatically disqualified"]; *SpeeDee Oil Change Systems, supra,* 20 Cal.4th at p. 1147 ["The most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation"].) There are no cases that address "the use of ethical walls when the same legal office represents clients with directly adverse interests in the same matter in successive litigation," as the trial court put it, because, in that scenario, disqualification is mandatory. (*Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 114.)

15

question we are dealing with two client engagements on substantially related subject matter and that Foor's former representation of Melton was "direct" and "personal." While that means a presumption of shared confidences arises—which, in theory, might taint all lawyers in the Public Defender by imputation—the presumption has been rebutted under *Rhaburn*, and no reasonable finding could be made to the contrary on the undisputed facts presented in this case.

The reasons why are plain. To begin with, the "tainted" lawyer here—Foor—no longer practices law and is a stranger to the Public Defender. It seems to me that that, alone, is enough to defeat any presumption that Foor retains Melton's formerly privileged information and to eliminate any risk that he may pass along that information to the Public Defender. But there is more. We also have the fact that (1) no attorney who currently works for the Public Defender worked there during either of the prosecutions of Melton, (2) the prosecutions of Melton have been over for more than three decades, (3) after diligent search, the Public Defender reports it has no records relating to Foor's representation of Melton, and (4) the Public Defender has an ethics-driven commitment not to solicit confidential information from Foor.

When it comes to Cain's right to conflict-free counsel (*Rhaburn*, *supra*, 140 Cal.App.4th at pp. 1580–1581), this factor—which, by itself could justify disqualification, as the trial court recognized—cuts against disqualification on the record before us. Just as in *Rhaburn*, where the assigned "deputy public defenders . . . credibly represented that they feel no constraints in investigating" putting on a defense at trial, and had "no motive to 'pull their punches,'" Cain's "expression of willingness to continue with an attorney with whom he has formed a relationship should be respected." (*Id.* at p. 1581.)

16

But while it is certainly relevant that Cain wishes to continue with lawyers who have credibly represented that they are prepared to "vigorously pursue all avenues of defense" (*id.* at p. 1580),[15] that is only one factor among many when applying the *Rhaburn* test, not *the* featured consideration.  It is, as I read *Rhabur*n, a necessary but not sufficient basis for concluding that the presumption of shared confidences has been rebutted.

The only totality of the circumstances factor mentioned by *Rhaburn* that might arguably cut against the Public Defender's position opposing disqualification comes under the heading of the "nature and notoriety" of the prior representation.  (*Rhaburn, supra,* 140 Cal.App.4th at p. 1581.)  It does seem plausible that Foor *might* recall some previously unrevealed specifics about his handling of Melton's defense in such a high profile, high-stakes case as this one, even after all these years.  But because he no longer has any affiliation with the Public Defender, there is no reason to go the next step, purely by legal fiction, and attribute to every current lawyer who works in the Public Defender all confidential information Foor possessed in connection with his defense of Melton.  No matter how weighty and momentous that defense was at the time he pursued it, Foor's representation of Melton is now in the distant past and, so far as this record shows, there is no trace left of it beyond what is already in the public record.

Accordingly, I would reverse for abuse of discretion because (1) in failing to apply *Rhaburn,* the trial court misapplied the law, and (2) under *Rhaburn*'s totality of the circumstances test, the only reasonable reading of this record is that the Public Defender has rebutted the presumption that

---

[15] If there were any genuine question about this, disqualification may have been warranted under *People v. Jones* (2004) 33 Cal.4th 234, for reasons wholly independent of any concern about potential misuse of confidential information, as the trial court recognized.

17

Foor possesses Melton's formerly privileged information, which defeats the People's attempt to invoke the doctrine of vicarious disqualification.

## III.

The hardest question presented here is whether the duty of client confidentiality continues not just after termination of the attorney-client relationship, but after the client's death. The trial court answered that question no, presupposing that the duty of confidentiality is coextensive with the attorney-client privilege, which lapses when a client dies. The statutory duty of confidentiality cannot be viewed as an evidentiary privilege, the trial court ruled, because only the Legislature can create privileges. (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 373.) That led the court to conclude Foor is no different than any other witness with potentially relevant information. "Except as provided by statute, no person has a privilege to refuse to be a witness or to refuse to disclose any matter or produce any writing, object or thing," the court pointed out. (See Evid. Code, § 911, subd. (a) ["No person has a privilege to refuse to be a witness."].)

There is much to unpack here. All panelists reject the trial court's premise that Foor's duty of confidentiality to his deceased client ceased to exist at Melton's death. But we do no more than restate our conclusion on that critical point, with a citation to the Reporter's comment accompanying section 60, "A Lawyer's Duty to Safeguard Confidential Information," of the Restatement (Third) of the Law Governing Lawyers published by the American Law Institute, along with a brief observation that "the duty prevents Foor from voluntarily disclosing anything he learned in confidence from Melton." (Maj. opn. *ante*, at p. 13.) We say nothing about whether, should any party call Foor to testify at trial, the court may override his

18

continuing duty of confidentiality and order him to answer questions about what Melton once told him behind the veil of the attorney-client privilege.

We should treat these difficult issues in greater depth.

## A.

The trial court began its analysis from a sound starting point:  in California, once the client in an attorney-client relationship dies, the attorney-client privilege lapses.  This is because, under the statutory scheme governing the attorney-client privilege in this state, no one is authorized to assert the privilege "if there is no holder of the privilege in existence."  (Evid. Code, § 954, subd. (c).)  Evidence Code section 954, subdivision (c), is, in effect, a rule of standing.  Once the client dies there is no one left to assert the privilege, since no privilege holder exists.  But while the privilege remains in effect, a lawyer has a *duty* to "refuse to disclose" (Evid. Code, § 954) confidential communications with the privilege holder (Evid. Code, § 955).

Having correctly recognized that the attorney-client privilege in California dies with the client, the trial court spotted the key weakness in the People's motion as filed.  The People relied on *Swidler & Berlin*, *supra*, 524 U.S. 399, a well-known case decided thirty years ago in the context of federal grand jury proceedings being conducted by Independent Counsel Kenneth Starr in connection with the firing of employees at the White House travel office during the Clinton Administration.  A White House lawyer, Vincent Foster, consulted with James Hamilton, a lawyer at the firm of Swidler & Berlin, about possible Congressional investigations connected to the firings, and committed suicide a few days later.  When a federal grand jury, at the request of the Independent Counsel, served subpoenas on Hamilton and Swidler & Berlin seeking notes Hamilton made of his meeting

19

with Foster, a district court quashed the subpoena on attorney-client privilege and work product grounds. (*Swidler & Berlin*, *supra*, 524 U.S. at p. 402.)

The Independent Counsel's Office persuaded a panel of the D.C. Circuit Court of Appeals to vacate the order quashing the subpoena. The United States Supreme Court then reversed, addressing only the attorney-client privilege issue in an opinion authored by Chief Justice Rehnquist. Under Federal Rule of Evidence 501, he explained, " 'the common law . . . as interpreted by the courts . . . in light of reason and experience" governs a claim of privilege. (*Swidler & Berlin*, *supra*, 524 U.S. at p. 403.) Drawing guidance from a settled body of case law going back over 100 years, Chief Justice Rehnquist concluded that the attorney-client privilege survives the client's death and that it is categorical. (*Id.* at pp. 408–411.) He rejected the idea an exception for criminal cases might be available on a case-by-case basis, since "[b]alancing *ex post* the importance of the information against client interests, even limited to criminal cases, introduces substantial uncertainty into the privilege's application." (*Id.* at p. 409.)[16]

The Independent Counsel's Office unsuccessfully sought a much broader exception. It pointed to an established "testamentary exception" in the probate context; argued that that exception illustrates judicial

---

[16] Justice O'Connor dissented, expressing the view that "a criminal defendant's right to exculpatory evidence or a compelling law enforcement need for information may, where the testimony is not available from other sources, override a client's posthumous interest in confidentiality." (*Swidler & Berlin*, *supra*, 524 U.S. at p. 411 (dis. opn. of O'Connor, J.).) Justice Rehnquist, after noting there might be some potential exception where a criminal defendant's constitutional rights are implicated, did not address it further because such circumstances "clearly are not present here." (*Id.* at p. 408, fn. 3.)

recognition of the diminished importance of client confidentiality after a client's death; and, by analogy, contended that there is even stronger reason to recognize an exception sought by the government in criminal cases, where government's "interest in determining whether a crime has been committed should trump client confidentiality." (*Swidler & Berlin, supra*, 524 U.S. at p. 406.)  Unpersuaded, Chief Justice Rehnquist concluded that "the Independent Counsel has simply not made a sufficient showing to overturn the common law rule embodied in the prevailing caselaw.  Interpreted in the light of reason and experience, that body of law requires that the attorney-client privilege prevent disclosure of the notes at issue in this case." (*Id*. at p. 411.)

As the trial court recognized, the *Swidler & Berlin* holding has no application in this case because California follows a different rule. Legislatively, California has opted for a rule under which the privilege lapses with the death of the client.  The Law Revision Reporter's comments accompanying passage of the statute in 1965 explains this legislative choice: "[T]here is little reason to preserve secrecy at the expense of excluding relevant evidence after the estate is wound up and the representative is discharged." (Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 954, p. 344.)  The trial court appears to have assumed it must logically follow under California law that, once the attorney-client privilege disappears, there is nothing left of any confidentiality protection for what were formerly attorney-client privileged secrets, which is the polar opposite of the holding in *Swidler & Berlin*.  But no case or statute addresses this implicit assumption.  I believe the proper analysis of the continuing duty of confidentiality question is more nuanced than the trial court supposed.

## B.

The attorney-client relationship in California is governed by a mix of common law and statutory law; it is, fundamentally, a contractual relationship, but the duties of the attorney arise from agency law (e.g., an attorney's duty of loyalty as a fiduciary), tort law (e.g., an attorney's duty to exercise due care to a client), and statutory law (e.g., an attorney's duty to respect the attorney-client privilege and to preserve the client's confidences).

The confidentiality strand of the attorney-client relationship is governed specifically by Business and Professions Code section 6068, subdivision (e)(1), the most strongly worded of all statutory duties binding on a California attorney. (See *Stockton Theatres, Inc. v. Palermo* (1953) 121 Cal.App.2d 616, 625 [" '[t]he relation of attorney and client is one of highest confidence and as to professional information gained while this relation exists, the attorney's lips are forever sealed, . . . notwithstanding his subsequent discharge by his client' "].) Business and Professions Code section 6068, subdivision (e)(1) provides that it is "the duty of an attorney to," among other things, "maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client," subject to one narrowly drawn exception.[17] Rule 1.6 of the California Rules of Professional Conduct restates this nearly absolute duty as an ethical precept carrying disciplinary consequences for violations.

---

[17] Business and Professions Code section 6068, subdivision (e)(2) ("[A]n attorney may, but is not required to, reveal confidential information relating to the representation of a client to the extent that the attorney reasonably believes the disclosure is necessary to prevent a criminal act that the attorney reasonably believes is likely to result in death of, or substantial bodily harm to, an individual.").

Intertwined with the attorney's duty of confidentiality is the attorney-client privilege, a categorical immunity from compelled disclosure of communications between attorneys and clients that has been recognized for more than 400 years at common law (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599) and is codified at Evidence Code section 954. The statutory scheme governing the attorney-client privilege sets forth more than just an evidentiary privilege against compelled disclosure. It obligates an attorney to protect confidential client communications by refusing to disclose them under all circumstances. (Evid. Code, § 955.) In that respect Evidence Code section 954 and Business and Professions Code section 6068, subdivision (e), overlap to some degree, but there is a key difference.

While the attorney-client privilege covers only communications "that bear some relationship to the attorney's provision of legal consultation" (*Los Angeles County Board of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 294), the statutory duty of confidentiality sweeps more broadly. The duty of confidentiality is generally recognized to encompass more than simply communications with clients. It covers any "information [acquired] as a 'direct and proximate result' of the attorney-client relationship." (*Dixon v. State Bar* (1982) 32 Cal.3d 728, 735 (*Dixon*).) As a statutory duty that is a condition of every attorney's admission to the Bar, there is a public element to Business and Professions Code section 6068, subdivision (e), that transcends an individual client relationship, since the statute is designed to foster public confidence in the profession. (See *In re Jordan* (1972) 7 Cal.3d 930, 940–941 ["the protection of confidences and secrets is not a rule of mere professional conduct, but instead involves public policies of paramount importance which are reflected in numerous statutes"].)

Not only is the attorney's duty to protect client confidences broader than the attorney-client privilege (*Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 621, fn. 5), it complements the fiduciary nature of the attorney's duty to a client by barring the use of client confidences in any manner that might "cause public embarrassment" to, or prejudice the "honor and reputation" of a *former* client. (*Dixon, supra*, 32 Cal.3d at p. 735.) Courts have consistently made clear that the attorney's statutory duty to protect client confidences is of indefinite duration, continuing even after an attorney-client relationship is over. (*Stockton Theatres, Inc. v. Palermo, supra*, 121 Cal.App.2d at p. 625; see *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 786 [duty of confidentiality " 'survives the termination of the attorney's representation' "]; *Cobra Solutions, supra*, 38 Cal.4th at p. 846 [same]; cf. *In re Charlisse C, supra*, 45 Cal.4th at pp. 159–160 [referring to the "permanent confidentiality" of matters disclosed to the attorney in the course of a prior representation].)

## C.

Although the trial court correctly saw that *Swidler & Berlin* is an attorney-client privilege case and that its holding is particular to the law of privilege under Federal Rule of Evidence 501, the rationale in that case is worth bearing in mind because the importance of confidentiality protection to the attorney-client relationship is so central to its analysis.

As Chief Justice Rehnquist's opinion explains, "Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel. While the fear of disclosure, and the consequent withholding of information from counsel, may be reduced if disclosure is limited to posthumous disclosure in a criminal context, it seems unreasonable to assume that it vanishes altogether. Clients may be concerned about reputation, civil liability, or possible harm to friends

24

or family.  Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime."  (*Swidler & Berlin, supra,* 524 U.S. at p. 407; see *In re Sealed Case* (D.C. Cir. 1997) 124 F.3d. 230, 238 (dis. opn. of Tatel, J.) [describing the " ' "imperative need for confidence and trust" ' " in the attorney-client relationship].)[18]

Because all of the same things may be said of the vital role the attorney's statutory duty of confidentiality plays in fostering client candor and building trust between attorneys and their clients, we must reconcile Evidence Code sections 954 and 955 with Business and Professions Code 6068, subdivision (e)(1), without presupposing that the duty of confidentiality evaporates along with the attorney-client privilege.  Granted, there is some logical appeal to the view that, because California has legislatively departed from the common law, the attorney's statutory duty of confidentiality must

---

[18] Chief Justice Rehnquist's opinion in *Swidler & Berlin* essentially adopts the analysis in Judge Tatel's dissent, though Judge Tatel was somewhat more expansive about why the ex ante need for ironclad assurances of confidentiality may not be cast aside based on an ex post balancing test that weighs government's investigatory needs against a dead client's diminished interest in confidentiality.  As Judge Tatel explained it, "the assistance of counsel 'can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.' [Citation.] Because individuals frequently seek legal counsel concerning embarrassing, disgraceful, or criminal conduct, 'the mere possibility of disclosure' of communications about such subjects may 'impede development of the confidential relationship,' [citation], thereby eroding the substantial benefits to the justice system afforded by well-informed legal counsel . . . [¶] . . . [¶] Although rarely articulated, the rationale underlying the common law rule makes sense.  By preserving the privilege . . . , the law ensures that the privacy afforded those who confide in counsel extends to those who would otherwise take their secrets to the grave.  The common law rule thus encourages individuals to seek legal advice, bringing the benefit of such consultation to themselves, the legal system, and society." (*In re Sealed Case, supra,* 124 F.3d at pp. 237–238 (dis. opn. of Tatel, J.).)

logically expire with the attorney-client privilege upon the client's death. That view—held by the trial court in this case—has a neat symmetry, and the analysis stands to reason, but only to a point.

The interrelationship of the attorney-client privilege and the attorney's duty of confidentiality is complex. Because of the breadth of information covered by Business and Professions Code 6068, subdivision (e)(1), for example, the attorney is not automatically released from the duty of confidentiality whenever a confidential communication falls within an exception to the attorney-client privilege. Until the client dies, the privilege and the duty of confidentiality must necessarily operate in tandem to the extent they cover overlapping subject matter. Up to that point, the privilege holder—who is available to assert, waive, or otherwise relinquish the confidentiality attached to the attorney-client relationship—is in control of both the privilege and the duty of confidentiality. (See Cal. Rules of Prof. Conduct, rule 1.6(a) [client must give informed consent to disclosure]; see *Smith, Smith & Kring v. Superior Court (Oliver)* (1997) 60 Cal.App.4th 573, 579–580 [client waiver justifies disclosure].) To avoid undermining recognized exceptions to the privilege, it could not be otherwise. If the duty of confidentiality operated independently of the attorney-client privilege during the client's lifetime, the client and the attorney might end up taking opposing positions on whether confidences shared between them may become public.

But the logic of an analysis equating the statutory duty of confidentiality with the attorney-client privilege breaks down with the client's death. At that point, there is no longer any potential that client and attorney might take different positions on whether confidences should be preserved, and—assuming, until the client died, the attorney-client privilege remained intact (i.e., there was no waiver and no exception to either the

26

attorney-client privilege or duty of confidentiality controlled)—we are left with a conundrum. Pointing in one direction are Evidence Code sections 954 and 955, where the Legislature has declared an endpoint to the attorney's duty to protect confidential communications covered by the privilege, since no client "exists" to assert it. Pointing in another direction is Business and Professions Code section 6068, subdivision (e)(1), where the Legislature has required attorneys to abide by a broad, open-ended and facially perpetual duty of confidentiality.

How should we reconcile these conflicting statutory signals? Rather than assume the most recent of the statutes takes precedence over the earlier one, I would harmonize them. (See *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 955 ["We have recently emphasized the importance of harmonizing potentially inconsistent statutes."].) I agree with my colleagues that the Reporter's comment to section 60 of the Restatement (Third) of the Law Governing Lawyers points us in the right direction on this issue (Maj. opn. *ante*, at pp. 12–13), but I think we should anchor our conclusion in California law by finding a way to harmonize Evidence Code sections 954 and 955 with Business and Professions Code section 6068, subdivision (e)(1) as a matter of statutory interpretation. Specifically, I would hold that (1) the client controls whether the attorney is released from the ongoing duty of confidentiality while a client still "exists," (2) once the attorney-client privilege is extinguished following the client's death, the attorney remains bound by a duty of confidentiality to the deceased client, but (3) after the client's death, the attorney's duty of confidentiality, standing

27

on its own, establishes a rule of ethical conduct, and is not an evidentiary privilege.[19]

## D.

Where the trial court went wrong, most fundamentally, was in discounting the strength and significance of the attorney's statutory duty of confidentiality. The court focused on what it viewed as a "policy decision" that supposedly limited the Public Defender's ability to solicit "information" from Foor. In framing the issuing that way, the court's first mistake was in failing to identify what "information" from Foor the Public Defender might want to solicit. Presumably, the court had in mind that, if called, Foor might testify that Melton confessed his guilt to Foor in an attorney-client privileged conversation. Although the extensively documented record of the past prosecutions of Melton includes a confession from Melton, at oral argument, counsel for the Public Defender advised us that the evidence of that confession—the source, apparently, was Melton's former wife—has always been contested. If the Public Defender were able to bolster that proof by putting on Foor to testify that Melton confessed to him too, arguably that would strengthen Cain's third-party culpability defense to some extent.

As alluring as this strategic path may seem, it carries clear risks. Rather than supply evidence of a confession, for example, Foor might testify that Melton always insisted on his innocence. The hoped-for confession scenario is only the most dramatic way to illustrate the risk to Cain of

---

[19] Cf. *People v. Dang* (2001) 93 Cal.App.4th 1293, 1298–1299 (attorney's testimony to prove threats by a former client against witnesses properly admissible in a criminal prosecution of the former client; Business and Professions Code section 6068 held not a bar to the testimony, since it is a codified rule of conduct for attorneys, not an evidentiary rule).

pursuing "information" from Foor. Any number of other, less material facts Foor recalls from his conversations with Melton could similarly cut both ways—for or against either side. We should bear in mind here that Foor spent years trying to convince the People that they were pursuing the wrong man, and it may well be that he sees the charges against Cain as simply the fruit of the more complete investigation he always urged. By closing down the option of seeking "information" from Foor, the trial court surmised, the Public Defender created an intolerable risk of ineffective assistance of counsel, warranting replacement with conflict-free counsel. I agree with the majority that that was error. Because of the prospect that pursuing testimony from Foor in the blind could backfire against Cain's interests, the more significant problem is that this strategic option, if taken, might by itself amount to ineffective assistance of counsel.

But I would go beyond that. The trial court's more serious mistake was in too readily casting aside *Swidler & Berlin* without conducting a full analysis of Business and Professions Code section 6068, subdivision (e)(1). The court failed to appreciate that what it described as a "policy" decision by the Public Defender is simply a commitment to abide by ethical standards we expect all attorneys in California to follow. (Cal. Rules of Prof. Conduct, rule 1.6(b)–(e).) These ethical standards, as a practical matter, place Foor off limits to investigative inquiries in this case and thus to being called as a witness at trial, since no one will ever be in a position to develop a foundation for offering his testimony. It may be that in some circumstances due process might demand an exception to Foor's continuing duty under Business and Professions Code section 6068, subdivision (e)(1), as the *Swidler & Berlin* court appeared to recognize in acknowledging a potential exception to its privilege holding where a criminal defendant's constitutional rights are

implicated. (*Swidler & Berlin*, *supra*, 524 U.S. at p. 408, fn. 3.) But nothing on this record suggests that we are dealing with a problem of that nature, and neither party has advanced such an argument. That is why I approach the continuing duty of confidentiality issue in this case purely as a problem of statutory construction.

In view of Business and Professions Code section 6068, subdivision (e)(1), I would conclude that Foor is not just practically barred from answering any investigative inquiries or from being called to testify at trial, but legally barred from doing so as well. Due to the breadth of the statute and the patent inapplicability of its one exception, he is ethically obligated to say nothing about Cain's prosecution and cannot simply decide to share Melton's confidences with whoever may ask him to do so. This is so not because of the attorney-client privilege—which has expired—or any other evidentiary privilege, but because of the fixed constancy of his duty of confidentiality. Not only is he dutybound to preserve the secrecy of any knowledge he still has about Melton's defense, but other attorneys are dutybound not to ask him to share any of that knowledge. And unless we are prepared to countenance judicial orders directing attorneys to violate their ethical responsibilities, I think an order compelling Foor to testify in this case would be an abuse of discretion.[20]

---

[20] I do not suggest that attorneys are wholly off limits to being called to testify in cases in which they have served as counsel, even if called upon to testify adversely to their clients or former clients. (See e.g., *Romeo v. Jumbo Market* (1967) 247 Cal.App.2d 817, 820 ["if an attorney has relevant information he may be compelled to testify even if it is detrimental to his client, unless the information is privileged"].) But the reported cases addressing this issue involve scenarios in which the client is alive—and thus still able to control whether confidences reposed with counsel will remain secret—and there has either been a waiver of the attorney-client privilege or

*Swidler & Berlin* may not be the law in California, but in my view Business and Professions Code section 6068, subdivision (e)(1) supplies its practical equivalent. After a client's death, an attorney's duty of confidentiality is more than a vestige of the professional relationship Foor once had with Melton; it is a fixed statutory obligation he must observe for reasons that go beyond any individual attorney-client relationship. There may be room for debate about whether this is a good thing or a bad thing on a policy level, especially given the Law Revision Commission's view—adopted by the Legislature in codifying the attorney-client privilege—that, following a client's death, there "is little reason to preserve secrecy at the expense of excluding relevant evidence after the [client's] estate is wound up and the representative is discharged." (Cal. Law Revision Com. com., West's Evid. Code Ann., *supra*, foll. § 954 at p. 344.) Perhaps the Legislature should revisit Business and Professions Code section 6068, subdivision (e)(1) with the implications of such a strict rule of confidentiality in mind. Consider, for example, a scenario in which an attorney (or former attorney) in Foor's position, even at a distance of several decades, possesses information that might be pivotal to averting the wrongful conviction of an innocent defendant charged with a crime the attorney believes was committed by his deceased

some exception to the privilege applies. (See, e.g., *People v. Dang, supra,* 93 Cal.App.4th at pp. 1298–1299 [Evid. Code, § 956.5 exception to the attorney-client privilege allowed defendant's former attorney to testify that defendant told his attorney he would kill witnesses if he was not successful in bribing them]; *Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 100 [attorney may be compelled to testify if moving party makes prima facie showing that the crime-fraud exception applies]; *Titmas v. Superior Court* (2001) 87 Cal.App.4th 738, 745 [party seeking testimony from an attorney must "demonstrate that the privilege did not apply, an exception existed, or that there was an express or implied waiver"].)

31

client. But nothing on this record even remotely suggests that we could be dealing with that kind of moral dilemma here.

Absent legislative revision, we must read Business and Professions Code section 6068, subdivision (e)(1) according to its plain terms and apply the statute as written. I believe that has implications for the handling of this case going forward that we should more clearly state. Only if we undertake a step-by-step analysis of the trial court's flawed legal reasoning does the meaning of our holding on the attorney's continuing duty of confidentiality become clear. What we hold on this point is more than a doctrinal nicety. We are requiring Foor's silence, even in the face of circumstances in which his silence may lead to a grave miscarriage of justice.[21] In my view, that is no anomaly and it has nothing to do with Shawn Melton or Fred Cain. It is simply the cost of a rule designed to assure every member of the public that any attorney licensed in this state can be trusted to protect client secrets forever, "at every peril to himself or herself." (Bus. & Prof. Code, § 6068, subd. (e)(2).)

"Because individuals frequently seek legal counsel concerning embarrassing, disgraceful, or criminal conduct, 'the mere possibility of disclosure' of communications about such subjects has may 'impede development of the confidential relationship,' [citation], thereby eroding the substantial benefits to the justice system afforded by well-informed legal counsel." (*In re Sealed Case*, *supra*, 124 F.3d at p. 238 (dis. opn. of Tatel, J.).) This observation about the attorney-client privilege, made by the dissenting Circuit Court judge whose views presaged the Supreme Court's opinion in

---

[21] Based on District Attorney Abrams's report about a conversation with Foor (the source of the information about the six boxes), it appears that there have already been communications with Foor that may have inadvertently gone beyond merely confirming publicly available information.

*Swidler & Berlin,* also serves well as a description of the foundational purpose of Business and Professions Code section 6068, subdivision (e)(1). If there is to be any dilution of the strict confidentiality regime this statute creates—even under circumstances where there is no longer a living client to protect—the Legislature must loosen the statute. In the meantime, we cannot simply assume the statute does not mean what it says. Nor is the trial court empowered to abrogate the statute at trial based on a determination that Foor, like any other witness who has relevant, non-privileged, and admissible information, may be compelled to testify.

Trial Court: Superior Court of California, County of Solano

Trial Judge: Hon. Wendy Getty

Counsel: Oscar Bobrow, Chief Deputy Public Defender, Elena
D'Agustino, Public Defender, for Petitioner

Galit Lipa, State Public Defender, Nerissa Huertas and Ray
Ibarra, Deputy State Public Defenders for Office of the State
Public Defender as Amicus Curiae on behalf of Petitioner.

Brendon D. Woods, Public Defender and Kathleen Guneratne,
Assistant Public Defender for Alameda County Public
Defenders Office as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Rob Bonta, Attorney General, Christen Somerville, Deputy
Attorney General; Krishna A. Abrams, District Attorney,
Bruce Timothy Flynn and Paul D. Sequeira, Chief Deputy
District Attorneys, Michelle N. Fraser, Deputy District
Attorney, for Real Party in Interest.